**In re Gilbert W. COFFMAN and Billie S. Coffman, Debtors.**

**Bankruptcy No. 87–10171–B.**

United States Bankruptcy Court,
W.D. Tennessee, E.D.

Sept. 12, 1988.

Gilbert W. Coffman, Billie S. Coffman, Cedar Grove, Tenn., Lloyd A. Utley, Jackson, Tenn., for debtors.

Gary A. Vanasek, Asst. U.S. Atty., Memphis, Tenn., for Farmers Home Admin.

Harvey Boswell, Milan, Tenn., for Federal Land Bank.

Walter C. Drake, Standing Chapter 12 Trustee, Jackson, Tenn.

Julie C. Chinn, Asst. U.S. Trustee, Region VIII, Memphis, Tenn.

MEMORANDUM OPINION AND ORDER ON MOTION OF FEDERAL LAND BANK TO COMPEL PAYMENT TO UNSECURED CREDITORS OR IN THE ALTERNATIVE TO DISMISS

WILLIAM H. BROWN, Bankruptcy Judge.

This cause is before the Court on the motion of the Federal Land Bank to "Compel [payment to unsecured creditors] or in the Alternative to Dismiss." The issue, one of first impression in this District, is whether "net income" shown on these Chapter 12 debtors' annual report and used for on-going, post-confirmation farming operations constitutes "disposable income" which should be turned over to the Chapter 12 trustee for payment to unsecured creditors. The Federal Land Bank's (FLB) motion is supported by the Farmers Home Administration (FmHA) which has, through counsel, submitted a memorandum in support of its position. This is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2)(A) and (O) and the following constitutes findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## FACTUAL HISTORY AND FINDINGS

The debtors filed their voluntary petition for relief under Chapter 12 of the Bankruptcy Code on February 4, 1987. The schedules, filed concurrently with their petition, list Federal Land Bank and Farmers Home Administration as holders of secured claims. There were no holders of unsecured claims listed on Schedule A-3. On March 5, 1987, the debtors filed a proposed plan of reorganization. Although the collateral, and resulting proposed payment for secured claims, were assigned a lower value than the creditors' claim amounts, the initial plan contained no proposal for payments to unsecured creditors. However, following confirmation negotiations with creditors, the debtors amended their proposed plan to provide that pro-rata payments would be made on unsecured claims from available disposable income, the amount of which would be determined annually.

It should be noted that this amended provision for treatment of unsecured claims was not the result of any filed, formal objection by the Chapter 12 trustee or the unsecured creditors. Although the Federal Land Bank filed a written objection to the debtors' plan as initially proposed, that objection was directed toward the proposed treatment of its secured claim. Specifically, the Federal Land Bank asserted in its objection that the payments proposed in the plan to Federal Land Bank did not have a present value equal to the value of its collateral as required by 11 U.S.C. Section 1225(a)(5) and that the interest rate proposed on Federal Land Bank's fully secured claim was in violation of 12 U.S.C. Section 2015. This objection resulted in a valuation hearing which in turn resulted in a finding by the Honorable David S. Kennedy, Chief Judge, that the Federal Land Bank's claim was in fact undersecured. Thus, Federal Land Bank was left with a bifurcated claim pursuant to 11 U.S.C. Section 506(a). The confirmed plan provides for secured payments to FLB of $123,720.00, in annual installments over twenty-one years.

FmHA's position is similar. According to the debtors' schedules, its pre-petition claim was secured by a lien on the debtors' 1986 crops, a six-row corn header, and a second mortgage on the debtors' farm real estate. FmHA's proof of claim filed in this case reflects a pre-petition balance due of $26,304.14. Shortly after the case was filed, FmHA was allowed to set off funds in the amount of $10,322.74 against its pre-petition claim. The confirmed plan proposes to pay FmHA $1,000.00 at 8% per annum on its claim that is secured by the corn header. The balance of FmHA's claim is treated as unsecured in light of its second mortgage, undersecured position behind Federal Land Bank.

As observed previously, no formal objection to the treatment of their separate unsecured claim was filed by either creditor. Notwithstanding this fact, however, the plan was amended to include the following pertinent provision at the time of its confirmation on October 16, 1987:

880

## ARTICLE 6

### UNSECURED CLAIMANTS

Debtors hereby propose to pay unsecured claims on a pro-rata basis as disposable income is available, to be determined after the Debtors submit reports to the Court and to the trustee. Debtors will submit annual reports on or before the first day of February, 1988 and annually thereafter for two (2) years. During this three (3) year period, it will be determined whether there is net disposable income available to pay a portion of the unsecured claims and the amount so determined shall be submitted to the trustee for distribution.

Article 2 of the plan defines disposable income as "income remaining after the payment of reasonable living expenses and farm expenses." This plan definition is not as complete as the Bankruptcy Code definition. *See,* 11 U.S.C. Section 1225(b)(2), *infra.* Article 3-a of the plan provides that the debtors will make annual payments to the trustee on the first of December for the three years of the plan's duration. Pursuant to these plan provisions, the debtors' first annual payment to the trustee for disbursement to secured creditors was made in December, 1987, and their annual report was filed on January 29, 1988.

As filed, the debtors' annual report for the period of filing, February 4, 1987, through December 31, 1987, reflects gross income of $88,379.62. Total farm operation expenses are $51,304.25; household expenses are $10,646.80 and the Chapter 12 plan payment is $16,219.25. This plan payment included secured creditor payments and administrative expenses. Thus, "net income" of $10,209.33 is reflected on the report itself. No portion of this "net income" amount was submitted to the trustee for disbursement to unsecured creditors. Rather, according to testimony of Mr. Coffman, the net funds were used by the debtors to redeem part of their 1987 corn crop which was in government loan storage. The corn was then sold in this year for a higher price than that available in 1987, and Mr. Coffman further testified that he had made a profit of approximately $900.00

or $1,000.00 from this sale. He also testified that he had sold in this current year some soybeans produced in 1987 for approximately $15,000.00 and had stored for use as feed three thousand bushels of 1987 corn valued at approximately $5,000.00. In addition, Mr. Coffman inherited $7,012.87 during 1987. All of these funds have been used for planting and maintaining this year's crops, with the debtor stating that he had spent approximately $70,000.00 on his current crop.

Because the expense of producing the 1987 corn and soybeans was included in the calculations set forth on the debtors' 1987 annual report, the FLB and FmHA assert that the proceeds from the 1988 sales of the prior year's crops should be included in the debtors' 1987 income statement as should the value of the stored feed corn, rather than in the 1988 report as proposed by the debtors. Moreover, these creditors submit that the $3,935.00 amount allowed for depreciation of equipment on the debtors' 1987 report should be added to their net income, given that this amount was not actually "set aside" or spent by the debtors for replacement or repair of equipment. In fact, the debtors had an actual, separate maintenance and repair expense in 1987 of $1,999.53.

By including all of these sums in the debtors' 1987 report, the creditors have calculated $36,605.97 which they assert is "disposable income." As such, they contend that this amount should be paid to the trustee for distribution to unsecured creditors in accordance with Article 6 of the confirmed plan.

The debtors do not actually dispute the amounts, but it is the debtors' position that these funds were necessary for the production and maintenance of the current crop and, therefore, they do not constitute "disposable income." Mr. Coffman testified that because he used these funds for the production of this year's crop, he did not obtain an operating loan for 1988, and the debtors' current crop is unencumbered. Mr. Coffman stated that of his "net income," only three thousand dollars was left and this was needed for additional opera-

tion expenses. The unsecured creditors argue that they are in fact financing the debtors' 1988 crop and that the debtors should be required to obtain crop financing rather than operate at the unsecured creditors' detriment.

## CONCLUSIONS

In order to have a plan confirmed, a Chapter 12 debtor is required to commit all projected disposable income during the life of the plan to payment of unsecured claims if the amount proposed to be paid on such a claim does not equal its allowed amount *and* if an unsecured creditor or the trustee objects to confirmation. 11 U.S.C. Section 1225(b)(1).[1] Otherwise, the Code simply requires, with regard to holders of allowed unsecured claims, that the creditor receive as much on account of its claim as it would if the case were one under Chapter 7. 11 U.S.C. Section 1225(a)(4).

■ Given that the value of the debtors' assets in the instant case included no surplus which would have been available for distribution to unsecured creditors had the assets been liquidated, the requirement of Section 1225(a)(4) was clearly met at the time of the plan's confirmation. In addition, notwithstanding the lack of a formal objection to the original plan's proposal of no payments on unsecured claims, the plan, as confirmed, included the provision for payment of annually determined disposable income to the trustee for pro-rata distribution to unsecured creditors. Thus, at the time of confirmation, the plan complied with the requirements of Chapter 12 as to unsecured creditors.

In the future, unsecured or undersecured creditors should consider whether they have triggered Section 1225(b)(1) by an objection. Failure to object may have permanent effects. For example, Section 1227 of the Bankruptcy Code mandates that confirmation of a Chapter 12 plan binds the debtor and each creditor to its provisions,[2] whether or not such creditor's claim is provided for by the plan.

■ In view of the fact that the confirmed plan in the instant proceeding provides that the debtors' disposable income, to be determined annually, will be paid over to the trustee for application to unsecured claims, the central issue becomes, what, in this context, constitutes "disposable income." The Court has found little authority on this subject, as to Chapter 12 plans.

Section 1225(b)(2) of the Bankruptcy Code defines "disposable income" as:

> income which is received by the debtor and which is not reasonably necessary to be expended—
>
> (A) for the maintenance or support of the debtor or a dependent of the debtor; or
>
> (B) for the payment of expenditures necessary for the continuation, preservation and operation of the debtor's business.

Mr. Coffman testified that the "net income" shown on his annual report was not reasonably necessary for the maintenance or support of himself or his family during 1987. Family maintenance and support was not in dispute and was substantially met by the wife's non-farm income. However, Mr. Coffman contends that it has been reasonably necessary, pursuant to Section 1225(b)(2)(B), to expend all "net income" and more for the "continuation, preservation and operation" of his farming business in that it was necessary for production of this current year's crop. The creditors contend that the Code's definition of disposable income should be interpreted

---

1. 11 U.S.C. Section 1225(b)(1):

 If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
 (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claims; or
 (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

2. Although "binding," a Chapter 12 plan may be subject to post-confirmation modification pursuant to Section 1229. However, the Court has before it no motion for modification.

to mean all proceeds from the sale of crops produced in one crop year, less the cost of production for that one crop year, less necessary living expenses, and less the plan's secured and administrative payments. Under this approach, each years' income and expenses should be contained to that year, and any carry-over income would be disposable income. According to these creditors, any other reading would give the Code definition too broad a meaning. It is these creditors' position that it was Congress' intent to include the disposable income requirements in Chapter 12 as quid pro quo to creditors for the removal of the Section 1111(b) election, the absolute priority rule and the opportunity to vote for or against a plan of reorganization as required by Chapter 11. To hold otherwise, according to these creditors, would amount to allowing a debtor the unfettered use of current, otherwise disposable, income for the pre-payment of future expenses.

An analysis of this problem requires putting the issue in the context of the purpose behind Chapter 12. The legislative history pertaining specifically to Section 1225(b)(2) suggests:

Section 1225 defines "disposable income" as income which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor or for the payment of expenditures necessary for the continuation, preservation and operation of the debtor's business.

The conferees recognize that family farmers who are eligible for Chapter 12 may be involved in *minor* businesses not directly related to the farming operation. The Conferees intend that the term "debtor's business" in Section 1225 include such businesses.

(Emphasis in original) H.R.Rep. 958, 99th Cong., 2d Sess. 50; 132 Cong.Rec.H. 8999 (daily ed. Oct. 2, 1986); *reprinted at* Appx. Vol 3 King, *Collier on Bankruptcy* (15th Ed.), p. XXII–7. Unfortunately, this language does not lend much insight for our purposes into Congress' underlying intent regarding its definition of disposable income. The overall legislative history of Chapter 12, however, strongly indicates that Congress intended for this Chapter to provide an alternative opportunity to Chapters 11 or 13 for reorganization by the family farmer. There is no indication that the disposable income requirement or any other provision of Chapter 12 was intended by Congress to provide creditors with a quid pro quo for omission of the 1111(b) election, the absolute priority rule, or the opportunity to vote for or against the plan of reorganization. Rather, the history indicates that Chapter 12 is patterned after Chapter 13 and that these Chapter 11 provisions were purposely omitted.

Chapter 12 itself is described as an "extraordinary response to what is hopefully a temporary crisis." 132 Cong.Rep.S. 15075 (daily ed. Oct. 3, 1986) (comment of Sen. Thurmond), *reprinted at* Appx. Vol. 3, King, *Collier on Bankruptcy* (15th Ed.), p. XXII–15. Its extraordinary nature is illustrated by the fact that it is designed to be repealed on October 1, 1993. *See* Bankruptcy Judges, U.S. Trustees, and Family Farmer Act of 1986, P.L. 99–554, Sec. 302(f). As Judge A. Thomas Small observed: "It is emergency legislation which suspends a number of creditor protections which are available in Chapter 11 to facilitate family farmers reorganization." *In re Massengill,* 73 B.R. 1008, 1012 (Bankr.E.D. N.C.1987).

Specifically, Congressional intent that this Chapter parallel Chapter 13 is evidenced by the following passages taken from the Senate Report on Chapter 12:

... [H]earings in the House and Senate led to the unmistakable conclusion that the Bankruptcy Code does not work for farmers.

The conference report subtitle on family farmer reorganization, ... reconciles the unique attributes of farming into an existing bankruptcy framework, currently used by other small businesses and sole proprietors.

The subtitle creates an experimental, separate, chapter modeled after existing Chapter 13, solely for use by family farmers with up to $1.5 million in debts.

132 Cong.Rec.S. 15076 (daily ed. Oct. 3, 1986) (comment of Sen. Grassley), *reprinted at* Appx. Vol. 3, King, *Collier on Bankruptcy,* (15th Ed.) p. XXII–17.

Interestingly, the intent to omit some Chapter 11 provisions mentioned above is most strongly evidenced by the criticism directed at Chapter 12 in the following comment made by Senator DeConcini:

I am very worried that the extremely debtor oriented provisions of this chapter may force our farm lender to write off hundreds of millions of dollars of farm debt with no hope of recovering this debt when the farm crisis ends ...

The farm title has substantially revised long held doctrines of the bankruptcy code such as the absolute priority rule and the theories of adequate protection. This bill by not including the doctrines embraced by 1111(b) of the bankruptcy code has precluded a creditor from any hope of participating in an upswing in the value of its collateral ...

I urge the proponents of this new farm Chapter ... to monitor the ramifications of this chapter closely and to resolve and redress inequities that may result in a prompt fashion.

132 Cong.Rec.S. 15092 (daily ed. Oct. 3, 1986) (comments of Sen. DeConcini); *reprinted at* Appx. Vol. 3, King, *Collier on Bankruptcy* (15th Ed.) p. XXII–60–61. The Supreme Court in *Norwest Bank Worthington v. Ahlers,* —— U.S. ——, 108 S.Ct. 963, 970–71, 99 L.Ed.2d 169 (1988), observed the markedly different "relief provision[s]" in Chapters 12 and 11.

Inasmuch as the legislative history clearly establishes an intention that Chapter 12 parallel Chapter 13, it is logical to conclude that Section 1225(b) is patterned after Section 1325(b). The language of both sections are essentially the same, the one difference being that 1325(b) requires that the Chapter 13 debtor submit disposable income to the plan for the first three years of the plan only, while 1225(b) requires that the Chapter 12 debtor submit disposable income for three years "or such longer period as the court may approve under Section 1222(c)." 11 U.S.C. Section

1225(b)(1)(B). Ordinarily, application of the disposable income requirement arises in the confirmation context where the issues are whether the plan may be confirmed over the objections of unsecured creditors or the trustee, or whether the plan is feasible.

Because of the similarities of Sections 1225(b) and 1325(b), the case law which has developed with regard to the application of Section 1325(b) provides guidance for the application of Section 1225(b). *See generally,* Small, "Chapter 12—The Family Farmer Bankruptcy Act of 1986," *1987 Ann.Surv.Bankr.L.,* p. 157; *see also, In re Willingham,* 83 B.R. 552 (Bankr.S.D.Ill. 1988). Section 1325(b) was enacted in response to efforts to establish required minimal payments to unsecured creditors by Chapter 13 debtors beyond the bare requirements of the "best interest of creditors test." *In re Fries,* 68 B.R. 676, 682 (Bankr.E.D.Pa.1986).

There does not appear to be an established, exact standard of what constitutes disposable income pursuant to Chapter 12 or Chapter 13 from the reported cases. However, there seems to be agreement among the courts facing application of the disposable income requirement in Chapter 13 that the debtor must submit disposable income in accordance with the statute and provide the unsecured creditors with at least as much as they would receive in a liquidation. The determination of what constitutes disposable income is to be made on a case by case, factual inquiry basis. It appears that, at least for purposes of Chapter 13, the determination begins with a projection of the debtor's total income over the applicable repayment period. The courts are then required to examine the debtor's reported expenses to determine if they are reasonably necessary for the maintenance or support of the debtor or for continuation, preservation and operation of the debtor's business. *In re Fries, supra* at 682.

The majority of cases applying this analysis in Chapter 13 deal with expenses necessary for the maintenance or support of the debtor and family rather than expenses necessary for the operation of a

business. In most instances, the court's task is to subjectively characterize what is and is not disposable income by determining whether the expenses deducted from the debtor's total income are reasonably necessary for support and maintenance or are "luxury" expenses. *See, e.g., In re Chrzanowski*, 70 B.R. 447 (Bankr.D.Del. 1987); *Matter of Hale*, 65 B.R. 893 (Bankr. S.D.Ga.1986); *In re Navarro*, 83 B.R. 348 (Bankr.E.D.Pa.1988); *see generally*, Small, "Chapter 12—The Family Farmer Bankruptcy Act of 1986," *supra* at 157.

Where debtors are engaged in business and the objective of the plan is furtherance of the business, the disposable income analysis of necessity is similarly subjective. However, in accordance with the statute, the court must deduct from the debtor's gross income those expenses necessary for the maintenance of the business in addition to those necessary for the support of the debtor. The operative guide is one of reasonableness: That is, what is "reasonably necessary . . . for the continuation, preservation and operation of the debtor's business." 11 U.S.C. Section 1225(b)(2). In addition, "when a . . . plan proposes to preserve a debtor's business, the real [underlying] test is feasibility . . ." 5 King, *Collier on Bankruptcy*, (15th Ed.) par. 1325.-08[4][c]. In this case *sub judice* feasibility was found at the time of confirmation.

The objective of this plan is furtherance of the debtors' business. The business is farming. As such, it is logical to assume that in order to continue, preserve, and operate that business it was reasonably necessary for the debtors to pay the expenses associated with the planting, cultivation, and maintenance of their 1988 crop. But, was the use of the debtors' 1987 "net income" for the payment of such 1988 expenses reasonably necessary? The creditors say no and assert that all income in excess of operating expenses and debt service for a particular crop year (here 1987) must be paid to the trustee for disbursement to unsecured claimants.

While the Court is not unsympathetic to the concerns of the unsecured creditors, it must observe that, on its face, this argument is contrary to the plain language of Section 1225. This section clearly sets forth that, with respect to unsecured creditors, a Chapter 12 plan need only provide that they will receive as much as they would in a liquidation proceeding in order to be confirmed. 11 U.S.C. Section 1225(a)(4). In addition, the disposable income requirement clearly contemplates the use of excess income for the *continuation* of the debtor's business. As stated by Judge Peterson in *In re Janssen Charolais Ranch, Inc.*:

> disposable income is defined as income which is *not* reasonably necessary for the 'payment of expenditures necessary for the continuation, preservation and operation of the debtor's business.' 1225(2)(B). It necessarily follows that some amounts of income will be required to sustain the operation . . .

73 B.R. 125, 128 (Bankr.D.Mont.1987) (emphasis in original).

Assuming *arguendo* that the creditors' proposed requirement did not pose a conflict with the language of Sections 1225(a)(4) and 1225(b)(2), the Court could not ignore the impact that the creditors' requirement would have with respect to the feasibility of a proposed plan of reorganization for family farmers. In this regard, there is ample authority for the proposition that in order to meet the feasibility requirements of the Bankruptcy Code, a plan should provide for a "cushion" of money "to guard against life's expectencies [sic]." *In re Fries, supra* at 683, n. 7, *quoting from In re Otero*, 48 B.R. 704, 708 (Bankr. E.D.Va.1985). (The *Otero* Court actually said "life's unexpectancies" should be guarded against. The *Fries* Court thus misstates the quotation; however, in the case of farming, the misstatement is more accurate. One expects the unexpected in farming.). *See also, e.g., In re Greer*, 60 B.R. 547, 553 (Bankr.D.Co.1986). This proposition of a cushion has been adopted in the context of Chapter 12 by at least one court in the *In re Snider Farms, Inc.* case, wherein confirmation was denied due to the proposed plan's lack of feasibility. 83 B.R. 1003, 1014 (Bankr.N.D.Ind.1988). There, the Court observed that "some kind of

cushion must be provided in the plan to make it feasible, whether it be a chapter 11, 12 or 13." *Id; see also, In re Konzak,* 78 B.R. 990, 993–94 (Bankr.D.N.D.1987).

This seems particularly true in Chapter 12 where the objective is to ".... assist those farmers who have the true potential to reorganize and to allow them relief from heavy debt burden...." 132 Cong.Rec.S. 15075 (daily ed. Oct. 3, 1986) (comments of Sen. Thurmond); *reprinted at* Appx. Vol 3 King, *Collier on Bankruptcy* (15th Ed.) p. XXII–15. Clearly, adoption of the creditors' position would seriously jeopardize a Chapter 12 debtor's ability to meet the feasibility requirement. The unsecured creditors' argument is also self-defeating to those same creditors in their secured capacity. For a family farmer to reorganize and continue to pay on-going secured debt, that farmer must have a continuing business income. Without the use of some of that income to reasonably maintain the business, the plan will be short-lived. To force all net income to be disposable income would ignore the realities of farming economy.

As a practical matter, the Chapter 12 debtor's alternative to the use of excess income for continuation of his farming business is the obtainment of an operating loan secured by the current year's crop. In the case at bar, the debtor candidly testified that because he used income derived from the 1987 crop for production of this year's current crop, it was not necessary for him to obtain an operating loan. There is no proof as to whether he could have obtained such a loan. Even if he could, however, should he have been required to do so as a part of Section 1225(b)? The Code does not seem to impose such a requirement. It defines disposable income as that which is not *reasonably* necessary for the payment of continuing business expenses, rather than that which is not *absolutely* necessary.

From the above analysis, this Court concludes that in the Chapter 12 context, disposable income is intended to be income which is in excess of that *reasonably* required for maintenance and continuation of a debtor's farming operation from one year to the next.

 Having reached that conclusion, the Court realizes that the determination of what constitutes disposable income must be made on a case by case basis. Thus, the better approach to making that judicial determination appears to be that adopted by the Bankruptcy Court for the Southern District of Iowa in *In the Matter of Schwarz,* 85 B.R. 829 (1988). There, the Court concluded that the Chapter 12 trustee, mindful that the unsecured creditors must be paid at least as much as they would receive upon Chapter 7 liquidation, should review the debtor's financial statements at the end of each year and recommend a specific amount for distribution to unsecured creditors. Should the trustee and debtor be unable to agree or should unsecured creditors dispute the dollar figure upon which the trustee and debtor agree, they could challenge the distribution or lack thereof pursuant to Section 1229(a)(1). *Id.* at 832. Such an approach is clearly in line with the language of Section 1225(b) and the policies underlying chapter 12 and protects the interests of all affected parties.

In the case at bar, the debtor testified that he has expended approximately $70,000.00 thus far for the production of this year's crop. As discussed above, additional evidence establishes the existence of an excess income from what the debtors expended for the production of their prior year's crop. But, there is no evidence that these debtors could have obtained the funds necessary for production of the 1988 crop, and thus "continuation, preservation and operation" of their business, elsewhere. Assuming that this Court will be asked to hear any motions under Section 1229(a)(1), the Court will consider all relevant factors. A totality of circumstances will be examined to determine the extent to which the debtors' use of net income in each plan year is reasonable. For example but without limitation, the Court would consider:

1. The source of a debtor's annual net income; *i.e.,* is it derived from actual

farming operations or from government programs or from other sources. As a part of this inquiry, the Court may need to hear proof on the reasonableness of and actuality of business expenses for the prior year. For example, this Court questions whether paper losses such as depreciation are proper expenses for purposes of calculating "disposable income," which is a different calculation than one for tax purposes.

2. Whether a debtor was able to obtain current crop financing or made any effort to do so. This is not to say that the debtor must obtain such financing, but it is a part of the total "reasonably necessary" inquiry.

3. Whether a debtor reduced, maintained, or expanded the pre-Chapter 12 farming operation. In this regard, it would be a critical question whether any expansion of the farming business would be compatible with Section 1225(b)(2)(B).

Overall, this must be an inquiry, both by the trustee and the court, into what is commercially reasonable under all the facts and circumstances. The debtor must not be permitted to evade the payment of disposable income by improper expenditures. However, this is not a simple cash flow inquiry. *In Matter of Schwarz, supra* at 831. The Court is mindful that the debtors should not accumulate an unreasonably large reserve of funds which could be a windfall at the time of discharge. Neither should the debtors be unreasonably hindered from reaching their reorganizational goal. The unsecured creditors are not left without hope for disposable income, but they must do more than show net income. Net income is simply not the equivalent of disposable income.

Therefore, in accordance with the standards set forth above, the trustee is directed to examine the debtors' financial reports, including, in this instance, projected income and actual expenses incurred in the production of this current year's crop, and to determine whether there is any 1987 income not reasonably necessary for the continuation, preservation, or operation of the debtors' farming business and thus available for distribution to these unsecured creditors.

IT IS THEREFORE ORDERED THAT:

1. The Motions of Federal Land Bank to Compel or in the Alternative, to Dismiss, are denied, without prejudice to a renewal or amended motion under Section 1229(a).

2. The Chapter 12 trustee is to examine the debtors' annual financial report, including the projected income and actual expenses incurred in the production of this current year's crop, and to determine whether there may be 1987 income available for distribution to the unsecured creditors. The trustee may further examine the debtors if necessary. The trustee will then make a recommendation to the debtors, unsecured creditors and the Court.