## In re Myron Martin KUHLMAN and Joy Frances Kuhlman, Debtors.

### Bankruptcy No. 88–10093–INH.

United States Bankruptcy Court, D. South Dakota, N.D.

Sept. 6, 1990.

John S. Lovald, Pierre, S.D., for AgriStor Leasing.

A. Thomas Pokela, Chapter 12 Trustee, Sioux Falls, S.D.

Thomas Tobin, Aberdeen, S.D., for debtors.

## MEMORANDUM–DECISION

IRVIN N. HOYT, Chief Judge.

The matter before the Court is a Motion for Determination of Disposable Income and Requirement for Turnover Thereof filed by Chapter 12 Standing Trustee A. Thomas Pokela (Trustee) and the resistance thereto filed by Debtors Myron and Joy Kuhlman (Debtors). A hearing was held April 17, 1990, and after briefs were filed the matter was submitted to the undersigned for consideration. The Court issues this ruling which shall constitute Findings and Conclusions as required by Bankr.R. 7052. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1).

### I.

Debtors filed a petition for Chapter 12 relief on May 10, 1988. Debtors' Amended Chapter 12 Plan was confirmed by order entered November 21, 1988. The Plan pro-

vided that Debtors would pay all net disposable income to unsecured creditors for three years.

On February 28, 1990, Trustee filed a Motion for Determination of Disposable Income and Requirement for Turnover Thereof. Therein, Trustee sought a judicial determination of Debtors' net disposable income for 1988 and 1989 in accordance with Debtors' Plan and as evidenced by Debtors' financial records. Debtors filed a Resistance on April 10, 1990, and urged the Court to find that Trustee had the burden to determine net disposable income. Further, Debtors argued that they were not bound by the disposable income provision in their Plan because no undersecured or unsecured creditors had objected to the Plan and because those creditors would receive as much under the Plan as they would in a Chapter 7 liquidation. Unsecured creditor AgriStor Leasing (AgriStor) filed a Notice of Appearance in the matter on April 10, 1990, and stated it would participate in the scheduled hearing.

At the beginning of the hearing the Court cited *In re Coffman,* 90 B.R. 878 (Bankr.W.D.Tenn.1988), as the leading case on the disposable income question. The Court indicated that the guidelines for determining net disposable income established by *Coffman* would be relevant in this case. Trustee acknowledged that prior to the hearing he had not informed Debtors in writing of the amount of disposable income he had computed but Trustee indicated he had told Debtors' counsel that $60,000 was sought. With the premise that Trustee did have the burden to prove the amount of disposable income available, the Court received testimony from several witnesses and numerous documents were admitted into evidence.

Debtors are competent, successful dairy farmers who maintain a conservative lifestyle. The size of Debtors' dairy herd increased from 100 milk cows (15 dry) at the time of their petition to 105 to 108 head at the time of the hearing (15 to 18 dry). At the time of their petition Debtors had 19 or 20 steers; at the time of the hearing they had 24 steers. Debtors have approximately 132 head of replacement heifers of various ages and calves. Debtors farm the same number of acres now as when they filed their petition. Debtors experienced higher than expected feed costs in 1988 and 1989 because of drought conditions.

In 1985, 1986, 1987, and 1988 (prior to Debtors' petition), Debtors borrowed operating money from Farmers and Merchants Bank (Bank). Post-confirmation, Debtors did not formally attempt to borrow any more money from Bank. Bank's policy was not to extend credit without the approval of its board of directors to persons who had sought the protection of a Chapter 12 bankruptcy. Debtors have not sought a loan from any other lending institution, including Farmers Home Administration.

Trustee presented several exhibits which purported to show disposable income for 1988 and 1989. Trustee calculated disposable income for 1988 by deducting Debtors' farm expenses of $191,873 (as reported on their farm record books), plan payments of $48,102, and living expenses of $22,350 (as reported on their 1988 annual report) from Debtors' income of $335,132 (as reported on their 1988 tax return) to arrive at a final difference of $72,807. Trustee did not exclude any 1988 capital improvement expenditures from total expenses so the issue of whether all 1988 expenditures were reasonable and necessary for the continuation, preservation, and operation of the business was not raised.

Trustee calculated Debtors' 1989 disposable income by using income of $364,333 [1] (from Debtors' monthly and annual reports) and subtracting expenses of $276,188 (from Debtors' farm record book). From that difference, a net income of $88,145, Trustee deducted plan payments of $45,245 (as set forth on their 1989 annual report) and Debtors' actual 1988 annual living expenses of $22,350. His intent in using Debtors' 1988 living expenses when

---

1. The 1989 total income figure stated on Exhibit D is in error by + $3.00. All affected sums and differences have been corrected herein.

**734**

computing disposable income for 1989 was to compensate for the fact that Debtors stated on their 1989 annual report that they had living expenses of $36,029 while only $20,000 in living expenses was projected in Debtors' Plan.[2] After these plan payments and living expenses were deducted, Trustee added capital improvement expenses of $16,027 and prepaid expenses of $16,377 from Debtors' 1989 annual report. These capital improvements were for a newer pickup, a bedding chopper, a push feed cart, a cultivator, a round baler, a grain truck, a loader, and seven head of livestock. Finally, Trustee added $9,295 in capital expenditures that were identified in Debtors' farm record book as feed lot improvements and earth work. Trustee deemed the final sum, $62,249, as the disposable income for 1989.

No evidence was presented to rebut Debtors' testimony that the capital improvement expenditures were reasonably necessary for the continuation, preservation, or operation of their farm. In fact, Trustee's investigator-analyst Lewis Dirks testified that he did not review Debtors' capital expenditures to determine if any were unnecessary or unreasonable. Mr. Dirks also indicated that he did not know whether the capital improvement expenses of $16,027 and prepaid expenses of $16,377 identified from Debtors' 1989 annual report were originally included in the $276,188 in expenses set forth on Debtors' farm record book.

In summary, Trustee presented some evidence that Debtors had $72,807 in disposable income available in 1988 and $62,249 in disposable income available in 1989.

Myron Kuhlman (Debtor) testified that Debtors had no disposable income and that any money left at the end of 1988 or 1989 would have been put back into the farming operation. Debtors based this conclusion on a 1989 "Profit & Loss Statement" that indicated Debtors lost $23,415.85; a "Profit & Loss Statement" for May 10, 1988 (date petition filed) through December 31, 1988,

that indicated Debtors had net income of $6,585.06 for those post-petition months; and a "Profit & Loss Statement" for January 1, 1990 through March 31, 1990 (the last full month before the hearing on Trustee's Motion) that indicated Debtors' income exceeded expenses by $33,366.10 for those four months. Debtor characterized these exhibits as cash flow statements computed from Debtors' check registry. Debtor, however, was unable to explain why his 1989 annual report (Exhibit L) and his profit and loss statement for 1989 (Exhibit 1) had different living and feed expense figures. Debtor testified that he "hoped" that the annual report given to Trustee was accurate.

Under questioning by AgriStor, Debtor denied Debtors had disposable income of $72,807 (the amount identified by Trustee) in 1988 but agreed that their 1988 taxable income plus their depreciation expense allowance indicated Debtors should have around $60,000 in available cash. It was the opinion of AgriStor's witness, Ray Meligan, appraiser and agricultural financial consultant, that Debtors had sufficient flexibility in their cash flow to make some payments to unsecured creditors. Further, he found that Debtors had in excess of $200,000 in disposable income available from 1988 and 1989 and that $100,000 could be paid from Debtors' dairy proceeds without hindering their operation. He based this conclusion on the premise that Debtors had expanded their operation during the past two or three years as evidenced by the addition of machinery, cattle lots, and vehicles and an increase in prepaid expenses and the value of livestock. Mr. Meligan did not, however, identify sufficient money in Debtors' daily operation to support a $100,000 finding of disposable income other than from Debtors' accumulated net profits. Like Mr. Dirks, Mr. Meligan did not render an opinion on whether Debtors' various farming expenditures were reasonable.

Debtor agreed that their actual living expenses for 1989 were about $24,000 and

**2.** The Court is unable to decipher from the Plan any clear statement of projected living expenses. All parties, however, seem to agree that the Plan contemplated living expenses of approximately $20,000.

that the figure on their 1989 annual report was in error because Joy Kuhlman (Co-Debtor) had not clearly delineated all living expenses from farm expenses when she did the bookkeeping. Debtors' actual living expenses for 1990 to the date of the hearing better reflected those projected in their Plan.

Debtors paid no income taxes in 1988 but had approximately $20,000 in capital gain income from the 1988 sale of steers purchased in 1987 and Debtors had a business investment credit set off against taxable income of $25,155 in 1988. Debtors each made an I.R.A. contribution of $1,000 for the 1988 and 1989 tax years. Debtors' 1989 tax return was not put into evidence.

## II.

A Chapter 12 plan of reorganization cannot be confirmed over the objection of the trustee or an unsecured claim holder unless the claim is satisfied in full or

> the plan provides that all of the debtor's projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1225(b)(1)(B). Disposable income is defined as

> income which is received by the debtor and which is not reasonably necessary to be expended—
>
> (A) for the maintenance or support of the debtor or a dependent of the debtor; or
>
> (B) for the payment of expenditures necessary for the continuation, preservation, and operation of the debtor's business.

11 U.S.C. § 1225(b)(2) (in pertinent part). The Bankruptcy Code does not set forth an exact procedure or timetable for determining disposable income nor does it clearly state who has the burden of showing the amount, if any, of net disposable income available. The Code does provide, however, that the debtor must commence making timely payments under the plan and avoid material default on the terms of the plan or face possible dismissal of the case. 11 U.S.C. §§ 1208(c)(4) and 1208(c)(6). Fraudulent actions by a debtor may also lead to dismissal. 11 U.S.C. § 1208(d). Moreover, the debtor must complete all payments under the plan in order to receive his discharge in Chapter 12. 11 U.S.C. § 1228(a).

The trustee's burden is to ensure that the debtor commences making timely payments under the plan, 11 U.S.C. § 1202(b)(2), and oppose discharge "if advisable." 11 U.S.C. § 1202(b)(1) and § 704(6). Both the trustee and debtor must make a final report and file a final account of the administration of the estate with the Court and the United States Trustee. 11 U.S.C. §§ 1202(b)(1), 1203, 1106(a)(1), and 704(9).

## III.

The absence of any specific procedural guidelines in the Bankruptcy Code and the limited legislative history on the disposable income or "ability to pay" test of 11 U.S.C. § 1225(b)(1) provide few guidelines that the Court, Chapter 12 trustees, debtors, and creditors may follow to arrive at an expedient, just determination of net disposable income. *See In re Schwarz*, 85 B.R. 829, 830–31 (Bankr.S.D.Iowa 1988). Several bankruptcy courts, however, have been asked to define and calculate disposable income and determine when it should be paid. Their decisions provide at least three noteworthy points of consensus.

First, many courts interpreting § 1225(b) were guided by Chapter 13 cases that discussed § 1325(b). *In re Bowlby*, 113 B.R. 983, 988 (Bankr.S.D.Ill.1990); *In re Young*, 103 B.R. 1021, 1022 (Bankr.S.D.Ind.1988); *Coffman*, 90 B.R. at 883; *Schwarz*, 85 B.R. at 830–31; and *In re Willingham*, 83 B.R. 552 (Bankr.S.D.Ill.1988). The similarities between the two Code provisions and Congress' intent that Chapter 12 parallel Chapter 13 have been clearly recognized. *Coffman*, 90 B.R. at 882–83 (citing 132 Cong. Rec.S. 15076 (daily ed. Oct. 3, 1986)). The policies and procedures that evolved from

§ 1325(b) were found to provide useful insight when addressing § 1225(b).

Second, the courts interpreting and applying § 1225(b)(1) have held that this "ability to pay" test is an independent requirement for confirmation from, and is not subsumed by, the "best interest of creditors" test of § 1225(a)(4). *Willingham*, 83 B.R. at 553–54; *In re Rott*, 94 B.R. 163, 167 (Bankr.D.N.D.1988); *In re Borg*, 88 B.R. 288, 291–92 (Bankr.D.Mont. 1988) (reversing *In re Fauth*, 79 B.R. 490, 491 (Bankr.D.Mont.1987)). Even though an unsecured creditor may not receive anything if the estate were liquidated under Chapter 7, the plan must still provide that the creditor is entitled to recover his claim from a Chapter 12 debtor's post-confirmation net disposable income if he or the trustee objects to the proposed plan.

Third, several of the courts recognized that the calculation of disposable income includes a subjective analysis since there must be an inquiry—on a case by case basis—of what expenses are "reasonably necessary" for the maintenance or support of a debtor and his family or the continuation, preservation, and operation of his business. *See, e.g., Rott,* 94 B.R. at 166; *Coffman,* 90 B.R. at 884. The court in *Coffman* set forth three, non exclusive factors to consider:

1. The source of a debtor's annual net income, i.e., is it derived from actual farming operations or from government programs or from other sources...: [T]he Court may need to hear proof on the reasonableness of and actuality of business expenses for the prior year.... [And] this Court questions whether paper losses such as depreciation are proper expenses for purposes of calculating "disposable income,"....

2. Whether a debtor was able to obtain current crop financing or made any effort to do so....

3. Whether a debtor reduced, maintained, or expanded the pre-Chapter 12 farming operation. [It is] a critical question whether any expansion of the farming business would be compatible with Section 1225(b)(2)(B).

*Coffman,* 90 B.R. at 885–86; *see also Bowlby,* 113 B.R. at 989. The court in *Bowlby* agreed with the court's conclusion in *Coffman* that a debtor is not required to seek credit for crop production expenses.

Because the necessity and feasibility of borrowing depend upon an individual farmer's cash flow situation, no *per se* rule may be stated as to whether a farmer who has availed himself of Chapter 12 protection should be required to borrow the funds to produce his crop following bankruptcy in order to meet the disposable income requirement of § 1225(b)(1).

*Bowlby,* 113 B.R. at 989; *compare Young,* 103 B.R. at 1022 (disposable income does not include "that part of net operating income above what is reasonably necessary to pay the upcoming year's expenses without obtaining credit").

The court in *Coffman* summarized its philosophy for calculating disposable income:

Overall, this must be an inquiry ... into what is commercially reasonable under all the facts and circumstances. The debtor must not be permitted to evade the payment of disposable income by improper expenditures. [T]his is not a simple cash flow inquiry. [Cite omitted.] The Court is mindful that the debtors should not accumulate an unreasonably large reserve of funds which could be a windfall at the time of discharge. Neither should the debtors be unreasonably hindered from reaching their reorganizational goal.

*Coffman,* 90 B.R. at 886. In essence, "[a] Chapter 12 debtor ... should not be allowed to profit from [bankruptcy], but should be placed on an equal footing with other farmers upon successful completion of his plan." *Bowlby,* 113 B.R. at 989.

In contrast to the three points of consensus discussed above, the courts that have addressed the disposable income issue in Chapter 12 cases have not uniformly answered the question of which party has the burden to show the amount, if any, of disposable income available. Led by the *Schwarz* decision, several courts have

placed this burden on the Chapter 12 standing trustee.

> At the end of the year, the [standing Chapter 12] trustee will review the monthly disclosure statements that have been filed with her and recommend a specific amount to the debtor for distribution to the unsecured creditor. In the event [the unsecured creditor] would dispute the dollar figure upon which the trustee and debtor agree, it could challenge the distribution as an unsecured claim holder under 11 U.S.C. section 1229(a)(1).

*Schwarz,* 85 B.R. at 832. Under this scheme, the debtor may likewise object under § 1229(a)(1), which governs modification of a plan after confirmation, if he disagrees with the trustee's calculation. *Farm Credit Bank v. Hurd,* 105 B.R. 430, 432 (W.D.Tenn.1989); *Rott,* 94 B.R. at 167; and *Coffman,* 90 B.R. at 885. These courts concluded that placing the calculation burden on the trustee comported with the language of § 1225(b) and the underlying policies of Chapter 12 and that it protected the interests of all affected parties. *Coffman,* 90 B.R. at 885; *Hurd,* 105 B.R. at 432 (quoting *Coffman,* 90 B.R. at 885).

A different procedural scheme for determining disposable income was adopted by the court in *Bowlby.* The court relied on a Chapter 13 disposable income decision and held that once an objecting creditor has satisfied an initial burden of producing satisfactory evidence that the debtor is not applying all of his disposable income to his plan, the ultimate burden of persuasion rests with the debtor to show that all disposable income is being submitted toward plan payments. *Bowlby,* 113 B.R. at 991 (citing *In re Fries,* 68 B.R. 676 (Bankr.E.D. Pa.1986)). Placing the ultimate burden on the debtor recognized that 11 U.S.C. § 1225(b)(1) requires the debtor to submit his disposable income for payments under the plan. *Id.* at 992. This approach also recognized that the debtor, not the trustee, is in the best position to compute and support with appropriate documentation the disposable income, if any, available for distribution to unsecured creditors through the trustee. *Id.* at 991.

## IV.

■ Debtors first contend that they are not obligated to submit disposable income, although their Plan provides for it, because neither Trustee nor any unsecured creditor objected to the Plan. Even though no objections were filed to Debtors' Amended Plan, this objection is without merit. Agri-Stor specifically objected to Debtors' initial plan that under § 1225(b)(1)(B) Debtors had failed to "clearly provide that all net disposable income of debtor for the first three full years of the plan will be paid to the unsecured creditors...." Debtors' Amended Plan responded to that objection and offered the appropriate treatment under § 1225(b).

■ Debtors' next argument against the payment of disposable income in this case is that § 1225(b)(1) is satisfied as long as creditors will receive as much as they would in a Chapter 7 liquidation, as required by § 1225(a)(4). As noted above, the majority of courts addressing this issue have held that each Code section is a separate requirement for confirmation. *See, e.g., Willingham,* 83 B.R. at 553–54; *Rott,* 94 B.R. at 167. While the application of § 1225(b)(1) is conditioned upon an objection to the plan, it is not an alternative treatment to the "best interest of creditors" test of § 1225(a)(4). This interpretation is consistent with that of § 1325(b) and § 1325(a):

> [T]he "ability to pay" test of § 1325(b) set[s] forth the definitive measure of required payments to unsecured creditors once the confirmation standard of § 1325(a) has been met. [Cite omitted.] The "ability to pay" test of subsection (b) was thus intended as an additional protection for holders of unsecured claims[.]

*Willingham,* 83 B.R. at 553. Legislative history on Chapter 12 does not indicate that a contrary interpretation of § 1225(a)(4) and § 1225(b)(1) was intended. Accordingly, this Court finds that § 1225(b)(1) is an independent requirement for confirmation when invoked by an appropriate objection by an unsecured creditor or the trustee and

is not satisfied simply because the "best interest of creditors" test of § 1225(a)(4) is satisfied.

■ Debtors' final contention is that Trustee failed to meet his burden of calculating and showing to the Court the amount of disposable income that Debtors should make available for payment of unsecured claims. For the reasons discussed below, this Court disagrees and holds that Debtors have the ultimate burden of persuasion to show that they are fulfilling the disposable income provision of their confirmed plan.

A careful analysis of § 1225(b) and § 1229 leads this Court to conclude that § 1229 is not the appropriate mechanism for insuring that available disposable income is turned over to the trustee for distribution. Section 1229 governs modification of a confirmed plan. In contrast, the calculation and timely payment of disposable income is an integral provision of most confirmed Chapter 12 plans. When a dispute arises between the debtor and trustee or among the debtor, trustee, and creditors about whether all disposable income has been paid, the real issue presented is whether the debtor has fulfilled all of the requirements of his confirmed plan. No modification of the plan is necessary to enforce the disposable income provision. Payments of disposable income to the trustee are no different than any other plan payment; the debtor is obligated to make them in compliance with his plan or face dismissal of his case or denial of discharge.

The Code does not require a trustee to pursue a Chapter 12 debtor in order to ensure that disposable income is turned over. As previously noted, under § 1202(a)(4) the trustee has the duty to ensure that the debtor commences making timely payments as required by the confirmed plan. Concomitantly, the debtor, under § 1208(c) must commence making timely plan payments and must avoid material default on the plan terms. If the debtor fails to make timely payments or if the debtor in some way materially defaults on his plan, including failing to turn over dis-

posable income if required by his plan, the trustee or an interested creditor could move for dismissal under § 1208(c). The trustee or creditor could also file a motion to dismiss for fraud under § 1208(d) if, for example, the debtor hides disposable income or subverts the trustee's or creditor's efforts to verify the debtor's financial status.

Further, § 1228(a) recognizes that discharge is contingent on the debtor making all payments under the plan. If the debtor has failed to turn over any disposable income or has miscalculated the sum available, he has not made all payments under his confirmed plan and, therefore, is not entitled to discharge. Pursuant to § 1202(b)(1) and § 704(6), the trustee should then object to discharge.

While a party objecting to discharge or seeking dismissal of a case has the burden of proving the merits of their motion or objection, Bankr.R. 4005 and *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1226 (8th Cir.1987), this Court joins with the court in *Bowlby* and finds that the debtor has the ultimate burden of persuasion to show that all payments under the plan are being or have been timely made, including payments of disposable income under § 1225(b)(1). *Bowlby*, 113 B.R. at 991–92. Once the trustee or a creditor has met their initial burden of producing satisfactory evidence that the debtor is not applying all of his disposable income to the plan, the debtor has the ultimate burden of persuading the court that appropriate payments have been made. *See Fries*, 68 B.R. at 685 (cited by *Zellner*, 827 F.2d at 1226, and *Bowlby*, 113 B.R. at 991).

Since neither the Code nor the Bankruptcy Rules specifically burden the trustee with the duty to calculate disposable income and since the debtor has all of the necessary financial information to do the task, the placement of this burden of persuasion on the debtor is appropriate. Granted, the trustee's and interested creditor's burden may not be lessened. They must still: (1) independently calculate the amount of disposable income available; (2) timely object to discharge or move to dis-

miss the case if the debtor has not made appropriate disposable income · payments; and (3) if an objection to discharge or motion to dismiss is filed, make a satisfactory showing that the debtor has failed to comply with his plan by not making appropriate payments of disposable income. In the end, however, the Court will look to the debtor to show that all disposable income payments have been timely made. Discharge will not be entered until the Court, Chapter 12 trustee, and all interested parties are satisfied that the Chapter 12 debtors have complied with their confirmed plan, including turning over of all disposable income.[3]

■ When a determination of disposable income is presented to the Court as a contested matter, each case must be examined upon the evidence presented. The Court will determine under the totality of the circumstances whether the debtor's expenses were reasonably necessary for family support and continuation, preservation, and operation of the farm as required by § 1225(b)(2). Factors the Court may consider include the amount of and reason for any variance in a debtor's actual income and expenses from those projected in the plan, the debtor's past borrowing practices, the availability of credit, and the necessity of any capital improvement. This Court will not adopt per se rules that prohibit all capital improvements or deny the debtor use of appropriate funds to plant next year's crops.

■ Undocumented numbers or mere estimates of past years' income and expenses will not be accepted. Projections of income and expenses offered to show the funds needed to continue the operation (such as seed and fertilizer for the coming crop year) must be grounded on historical figures.

The trustee, as well as the Court and creditors, should be able to rely on the accuracy of the monthly and annual financial reports prepared by Debtors. The Bankruptcy Code, as well as applicable bankruptcy crime statutes, tolerates nothing less. *See* 11 U.S.C. §§ 1203 (which incorporates §§ 1106(a)(1), 1106(a)(7), 704(2), 704(7), 704(8), and 704(9)), 1208(c)(1), 1208(c)(4), 1208(c)(6), 1208(d), and 1230; 18 U.S.C. §§ 152, 1001, 1961, and 3284. As noted above, a debtor's failure to turn over disposable income or his efforts to hide assets or otherwise hinder the trustee's verification of financial information may constitute fraud. Chapter 12 debtors should not take lightly the obligations imposed by the Code and their confirmed plan, including the obligation to comply with the disposable income provision of their plan. Failure to recognize these obligations could result in disastrous consequences.

Interested parties should not surmise that the Court will in all cases disfavor a negotiated settlement between a Chapter 12 trustee and the debtor of the sum of disposable income to be paid. Proper notice of any settlement and an opportunity for interested parties to object must be given pursuant to Bankr.R. 9019. The settlement should incorporate sufficient information to educate all other interested parties on the debtors' financial status and the appropriateness of the settlement.

Two key questions remain: (1) Has Trustee and AgriStor produced sufficient evidence that Debtors are not applying all disposable income to their Plan and, (2) have Debtors gone forward and presented sufficient evidence that there is no disposable income available?

■ Under the facts and circumstances of this case and based on the evidence presented, the Court concludes that Trustee and AgriStor have produced sufficient evidence that Debtors have not applied all disposable income to their Plan. Even

---

**3.** To date, this District has not required a Chapter 12 debtor to comply with §§ 1204, 1106(a), and 704(9) which direct a Chapter 12 debtor to "make a final report and file a final account of the administration of the estate with the court and with the United States trustee." Appropriate Local Rules will be formulated to standardize a Chapter 12 discharge procedure that incorporates a final report and account by the debtor.

when all 1988 expenditures are allowed as reasonably necessary for the support of Debtors' family and the continuation, preservation, and operation of Debtors' farm, Trustee's Exhibit C indicates Debtors had disposable income of over $70,000 in 1988. Debtors' own Exhibit 2 indicates Debtors had disposable income of $6,585.06 in 1988. For 1989, Trustee presented sufficient evidence that $20,550 in disposable income was available. Since Trustee and AgriStor have not rebutted Debtor's testimony that the capital and livestock expenses of $16,027, pre-paid expenses of $16,377, and the additional improvements of $9,252 were reasonably necessary for family support or the continuation, preservation or operation of the farm, those may not be included in disposable income.

The Court further concludes that Debtors have not gone forward with sufficient evidence to persuade the Court that no disposable income exists for either 1988 or 1989. First, numerous inconsistencies in Debtors' own records were identified. It was not possible for Trustee to resolve nor for Debtor to explain the inconsistencies between the income and expenses reported on Debtors' annual reports, monthly reports, farm record books, and income tax statement. In fact, Debtor testified, when some of the inconsistencies between his annual report and exhibits were shown, that it was his hope that the numbers reflected on his annual report to the Trustee were more accurate than his exhibit. Moreover, many of Debtors' checks did not have any notation that identified the goods or service being purchased so there is no definitive evidence that Debtors' exhibits were more accurate than Debtors' income tax return and the annual and monthly reports prepared for Trustee.

Second, other than stating that they had increased feed costs due to drought, Debtors did not explain why actual 1988 and 1989 income and expenses varied so greatly from those projected in their Plan. The Plan, confirmed near the end of 1988, projected 1988 income would be $251,000 but actual income was $335,132. Income for 1989 exceeded Plan projections by over $100,000 and expenses for 1989 exceeded Plan projections by at least $80,000. Debtors should be able to explain significant discrepancies such as these.

A continued hearing on Trustee's Motion will be scheduled so that Debtors may present rebuttal evidence. The Court acknowledges that the initial hearing was conducted on the premise that the Trustee carried the burden of persuasion to show how much disposable income is available. Having now ruled that this ultimate burden is on the debtor, it is incumbent on the Court to allow Debtors an opportunity to meet that burden. Trustee and AgriStor may offer surrebuttal evidence, including evidence of whether all capital expenditures and prepaid expenses were reasonable.

One additional evidentiary problem will need to be addressed at the continued hearing. The Court is unable to determine the exact sum of disposable income available in 1988 since the three years that Debtors have obligated themselves to pay disposable income did not begin until "the date that the first payment is due under the [P]lan". 11 U.S.C. § 1225(b)(1)(B) (in pertinent part). Most of Trustee's and AgriStor's evidence was based on year-end totals. The date of the first payment under the Plan and the disposable income which has accrued since that date need to be shown.

An order will be entered continuing the hearing.