**In re Robert G. BOWLBY and Rosemary Bowlby, Debtors,**

**In re James KIRCHNER, Debtor.**

**Bankruptcy Nos. BK 87–40511, BK 87–40162.**

United States Bankruptcy Court, S.D. Illinois.

May 11, 1990.

Wm. F. Meehan, Darrell Dunham, Carbondale, Ill., for debtors.

Terry Sharp, Wm. K. Richardson, Mt. Vernon, Ill., for .Farm Credit Bank.

Pamela Lacey, Benton, Ill., for trustee Bob G. Kearney.

## MEMORANDUM AND ORDER

KENNETH J. MEYERS, Bankruptcy Judge.

The Chapter 12 cases under consideration present a common issue of whether the debtors are entitled to a discharge at the end of their respective Chapter 12 plan periods over the trustee's objection that the debtors have failed to pay all of their disposable income for the benefit of unsecured creditors as required by their plans. In both instances debtors have retained income from the sale of their 1989 crops in order to pay expenses for the 1990 crop year following completion of their Chapter 12 plans. Debtors contend that the re- tained income constitutes income "necessary for the continuation, preservation, and operation of the debtor's business" (11 U.S.C. § 1225(b)(2)(B)) and so does not come within the definition of disposable income that is to be submitted for payment to unsecured creditors.

### Robert and Rosemary Bowlby

Debtors Robert and Rosemary Bowlby filed their third modified plan of reorganization on December 15, 1987, and the plan was confirmed on February 1, 1988. The confirmed plan specified that unsecured creditors would be paid by means of three annual payments "consist[ing] of the residue after payment of administrative expenses and payments to secured creditors." The Court's order confirming the plan stated:

> The Plan provides that all of the debtors' projected disposable income to be received in the three-year period, or such longer period as the Court may approve under § 1222(c).... will be applied to make payments under the Plan.

Paragraph IV of the debtors' plan, entitled "Means of Execution of Plan," provided:

> Upon confirmation, debtors will proceed to harvest their 1987 crops. Debtors shall retain sufficient funds for their necessary living expenses and for the planting and harvest of their 1987 [sic— should be 1988?] crop. Debtors' plan contemplates no further borrowings by the debtors. Debtors shall pay the trustee all of their disposable income for distribution to creditors.

In an appendix to their plan, the Bowlbys provided a statement of projected income and expenses for the first two years of their plan. The figures used by the Bowlbys showed that they would deduct projected living and crop expenses for 1988, as well as living and crop expenses for the remainder of 1987, from their 1987 income. The statement provided for payment of $4,709.11 to unsecured creditors in 1987 after plan payments were made to secured creditors and to the trustee. For the year 1988, the statement showed payments to

unsecured creditors of $20,643.76, with a balance of $101,592 remaining after payments to secured and unsecured creditors and payment of the trustee's fee. The statement contained no projections for the year 1989. The Bowlbys' plan provided that it was to continue until December 29, 1989.

On February 6, 1990, the Bowlbys filed a motion for discharge in bankruptcy, asserting that they had made payments to secured creditors as provided in their plan. They further stated that they had paid unsecured creditors approximately $16,000 over the life of the plan, with the payment of $1,000 in February 1988, $4,350 in December 1989, and $10,739.28 in January 1990.

### James Kirchner

Debtor James Kirchner filed his third modified plan of reorganization on October 13, 1987, and the plan was confirmed on November 4, 1987. The confirmed plan stated that unsecured creditors would be paid, in three annual payments, "the residue after the Chapter 12 trustee has paid administrative and secured claims as provided for in [the] plan." As in the case of the Bowlbys, the Court's order confirming the plan provided that all of the debtor's projected disposable income to be received in the three-year period, or longer period as approved by the Court, would be applied to make payments under the plan.

Paragraph IV, describing the "Means and Execution" of the debtor's plan, provided:

Upon confirmation of the plan, [the debtor] intends to sell his 1986 crop. From the sale of his 1986 crop and ... loans [from James Kirchner, Jr., and Velma Kirchner], he has sufficient funds to plant and harvest his 1987 crops. Given debtor's conservative estimates as to the potential yield of his crops, sufficient funds should be available to make all payments under the plan. Debtor shall then remit to the Chapter 12 trustee for dispersal to the creditors all disposable income.

A statement of projected income and expenses appended to Kirchner's plan showed that he would deduct projected living and crop expenses for 1988 from his 1987 income. Kirchner calculated that unsecured creditors would be paid $10,499.13 in 1987 after payments to secured creditors and to the trustee. The income and expense statement attached to the plan contained no projections for crop years 1988 and 1989. Kirchner's plan provided that it was to continue until January 10, 1990.

On January 25, 1990, Kirchner filed a motion for discharge in bankruptcy, which set forth his compliance with the terms of his plan. Kirchner stated that he had paid unsecured creditors nothing under the plan, "as there was nothing left after all administrative expenses and secured claims, as provided for in the plan, had been paid."

The Chapter 12 trustee has filed an objection to both the Bowlbys' and Kirchner's motions for discharge, asserting that the debtors have failed to pay all of their disposable income to the trustee for the benefit of unsecured creditors. With regard to the Bowlbys, the trustee alleges that they have retained excessive funds from their 1989 crop proceeds to be used for 1990 living and crop expenses. The Farm Credit Bank of St. Louis ("Farm Credit") has filed a like objection as an unsecured creditor of the Bowlbys.

With regard to Kirchner, the trustee alleges that Kirchner has prepaid 1990 crop expenses from 1989 crop proceeds and that he retains equity in 1989 stored grain and in a bank balance as of December 31, 1989. The Boatmen's Bank of Ziegler ("Bank"), an unsecured creditor of Kirchner's, has filed a memorandum in support of the trustee's objection, containing similar allegations of income retained by the debtor as of December 1989. The Bank further states that Kirchner purchased a pick-up truck in 1989 for the approximate sum of $10,000. The Bank asserts that these sums of money and property should be used to pay unsecured creditors pursuant to the plan.

At a combined hearing on both objections to discharge, debtor Robert Bowlby testi-

fied that his cash flow analysis shows that approximately $90,000 to $100,000 will be necessary to plant, preserve, and harvest his 1990 crops. This figure includes no amounts for the purchase or depreciation of equipment nor for liming his ground. Bowlby stated that he withheld $100,000 from his 1989 crop income to be used for 1990 crop expenses and sent the balance to the trustee. He estimated that an additional $28,000 to $29,000 will be needed for living expenses for his family, but stated that these expenses will be taken out of advance payments on government programs and out of proceeds from the sale of his 1990 winter wheat crop.

Bowlby testified further that he contacted two banks in his area to inquire about the possibility of obtaining an operating loan for 1990. In both instances, the bank officers told him that they could not make a direct loan to him "without a guarantee." Bowlby stated that the Farmers Home Administration ("FHA") holds a lien on his 1990 and future crops pursuant to his Chapter 12 plan. Bowlby testified that he has no unencumbered assets besides his crops and that his net worth is "probably negative."

On cross-examination, Bowlby stated that his contact with the banks had been by telephone and that he had provided no financial statement nor had he offered a secondary security interest in his crops. He had asked the banks for a specific amount of $100,000 but had not discussed a lesser amount.

Debtor James Kirchner testified that from his cash flow analysis he estimates that he will need between $100,000 to $110,000 to plant and harvest his 1990 crops. He stated that he prepaid approximately $59,000 worth of 1990 crop expenses in 1989 in order to reduce his tax liability for 1989 from $42,000 to $6,000. This money was obtained by means of a government loan on three bins of beans stored on his farm. Kirchner stated that he has since sold two of the bins of beans and that, after paying off the government loan on the beans, he should have $15,000 equity in the beans to be used for next year's crops. He further stated that he has $15,000 in a bank account, of which $6,000 is allocated for the payment of taxes and $9,000 is to be used for 1990 crop expenses.

Kirchner testified that he contacted his local bank and requested an operating loan of $40,000 but was told that he could not get a loan at this time. The bank officer in question told Kirchner that he may qualify for such a loan after the bank's loans are reclassified in July. Kirchner stated that he has no other asset to pledge for a loan other than his crops.

Kirchner testified further that he purchased a pick-up truck with his son in February 1989 pursuant to an order signed by the Court on March 26, 1987. This purchase was included in his December 1989 report to the trustee. On cross-examination by the trustee, Kirchner stated that he has 2,200 or 2,300 bushels of corn stored on his farm. Kirchner's December 1989 monthly report showed that he had a bank balance of $23,000 as of the end of December.

In arguing that the Court should grant their motions for discharge over the trustee's objection, debtors Bowlby and Kirchner contend that the 1989 income reserved by them for 1990 crop expenses is necessary for the "continuation" of their farming operations in the year following completion of their plans and, thus, does not constitute "disposable income" to be paid to unsecured creditors. The trustee and unsecured creditors, for their part, assert that section 1225(b) requires that disposable income "received" within the three year period of the debtors' plans must be paid to unsecured creditors upon expiration of the plans and should not be retained to finance the production of crops after the debtors have obtained their discharge.

Under 11 U.S.C. § 1225(b)(1)(B), if the trustee or an allowed unsecured creditor objects to confirmation of a debtor's Chapter 12 plan, the plan must provide that all of the debtor's projected disposable income to be received in the three year, or longer, period of the plan will be applied to make

payments under the plan. Section 1225(b)(2) defines "disposable income" as income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor; or

(B) for the payment of expenditures necessary for the continuation, preservation, and operation of the debtor's business.

11 U.S.C. § 1225(b)(2).

■ The issue of whether a debtor seeking discharge under Chapter 12 may use income received in the last year of a Chapter 12 plan to finance the next year's crop following expiration of the plan is, to this Court's knowledge, a novel question. Chapter 12 plans confirmed since the enactment of Chapter 12 in November 1986 are only now reaching completion, and the Court is unaware of any other case dealing with the question of disposable income in the context of a motion for discharge under Chapter 12.

The court in *In re Coffman*, 90 B.R. 878 (Bankr.W.D.Tenn.1988) considered a similar issue of whether income received in one year of a Chapter 12 plan could be "carried over" to pay crop expenses for a succeeding year of the plan. In *Coffman*, the debtor's annual report for 1987 showed "net income" of $10,209.33 following payment of 1987 farm and household expenses and plan payments to secured creditors. No portion of this "net income" was submitted to the trustee for disbursement to unsecured creditors. Rather, the debtor used this amount, as well as income inherited during 1987, for planting and maintaining his 1988 crop. As a result, the debtor did not obtain an operating loan for 1988 and that year's crop was unencumbered.

While the debtor in *Coffman* asserted that his 1987 "net income" did not constitute disposable income in that it was necessary for production of his 1988 crops, the unsecured creditors argued that the Code definition of disposable income should be interpreted to mean all proceeds from the sale of crops produced in one year, less the cost of production for that one crop year,

less necessary living expenses and the plan's secured and administrative payments. Thus, the creditors contended, each year's income and expenses should be contained to that year and any carry-over income would be disposable income.

The *Coffman* court discussed, at some length, the purpose of Chapter 12 and noted that the objective of the debtor's plan was furtherance of his farming business. The court rejected the creditors' argument that all income in excess of operating and debt service for a particular crop year was disposable income, finding that this was contrary to the plain language of section 1225 which "contemplates the use of excess income for the *continuation* of the debtor's business." *Coffman*, 90 B.R. at 884 (emphasis in original).

The court concluded that disposable income under Chapter 12 is intended to be "income which is in excess of that *reasonably* required for maintenance and continuation of a debtor's farming operation from one year to the next." *Id.* at 885 (emphasis in original). This determination, the court stated, must be made on a case by case, factual inquiry basis. The court enumerated various factors to be considered in determining the reasonableness of the debtor's use of net income during a plan year, including the sources of the debtor's annual net income and the reasonableness and actuality of business expenses for the year, whether the debtor was able to obtain current crop financing or made any effort to do so, and whether the debtor reduced, maintained, or expanded his farming operation during the year in question. The *Coffman* court, while mindful that Chapter 12 debtors "should not accumulate an unreasonably large reserve of funds which could be a windfall at the time of discharge[,]" observed that "[n]either should the debtors be unreasonably hindered from reaching their reorganization goal." *Id.* at 886.

The instant case is different from *Coffman* in that the debtors here seek to use income generated during the Chapter 12 plan to pay expenses following their discharge. In resolving the matter at issue, the Court must be cognizant of the concern

expressed in *Coffman* that the debtors may reap a windfall at the expense of their unsecured creditors if the disposable income requirement of the Code is not strictly enforced. The Court will, accordingly, conduct a two-part inquiry: first, does the Code language concerning "disposable income" allow the debtors to retain income received during their Chapter 12 plans to pay crop expenses arising after expiration of their plans and, if so, what constitutes "reasonably necessary" expenses to be paid out of plan income before disbursement to unsecured creditors.

Section 1225(b) provides no exact formula for determining compliance with the disposable income requirement. This requirement, which must be met before a plan may be confirmed over objection by a trustee or unsecured creditor, establishes a required minimum payment to unsecured creditors above the bare requirement that unsecured creditors receive at least as much under a proposed plan as they would upon liquidation (11 U.S.C. § 1225(a)(4)). *In re Willingham*, 83 B.R. 552 (S.D.Ill. 1988). Section 1225(b), like section 1325(b) on which it was modeled, was intended to resolve the issue of whether plans proposing to make only nominal payments to unsecured creditors met the confirmation requirement that a plan be proposed in good faith (11 U.S.C. § 1225(a)(3)). *Id.* By adding the disposable income requirement, Congress made it clear that, if other confirmation requirements were met, the debtor's payment of all disposable income during the plan period was a sufficient payment to unsecured creditors. *See 5 Collier on Bankruptcy*, § 1225.04 (15th ed.1989).

Section 1225(b)(1), which sets forth the disposable income requirement, and § 1225(b)(2), which defines disposable income, both refer to income "received" in the three year or longer period of the plan.

Calculation of income received during the plan period is, however, only one part of the formula for determining disposable income. From this amount must be deducted the debtor's reasonable living and business expenses. The latter part of the disposable income definition contains no limitation restricting deductible expenses to those incurred within a particular period of time. The statutory language, therefore, fails to support the contention that only a current year's expenses may be considered in determining the debtor's disposable income.[1] *Coffman; see also In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125 (Bankr.D. Mont.1987). Rather than a time limitation, the statute provides a standard of reasonableness and excepts from disposable income those amounts necessary for the debtor's maintenance and support and necessary for the *"continuation,* preservation, and operation of the debtor's business." 11 U.S.C. § 1225(b)(2)(B) (emphasis added).

The specific reference in § 1225(b)(2)(B) to expenses necessary for the "continuation" of the debtor's business indicates that deductible expenses need not be restricted to those incurred during the period of the plan. This provision, which contemplates the use of plan income to sustain the debtor's farming operation beyond a particular operating year, is in keeping with the objective of Chapter 12 to help farmers reorganize so that they may retain their land and continue farming.[2] It cannot be seriously contended that Congress intended that a debtor's farming operation continue during the life of the plan but not beyond the period of the plan. Giving effect to the language of § 1225(b)(2)(B), therefore, requires the conclusion that income received during the last year of the Chapter 12 plan may, if reasonably necessary to continuation of the debtor's farming operation, be

---

1. Because Chapter 12 plans generally provide for annual payments to creditors coinciding with the farmer's annual receipt of income, the calculation of disposable income, and the corresponding determination of "reasonably necessary" expenses, is likewise made on a yearly basis.

2. "[Chapter 12 was] designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land." H.R.Conf.Rep. 958, 99th Cong., 2d Sess. 48, U.S. Code Cong. & Admin.News 1986, pp. 5227, 5249; 132 Cong.Rec. H. 8999 (daily ed. Oct. 2, 1986); *reprinted at* Appx.Vol. 3 King, *Collier on Bankruptcy* at XXII–5.

retained for the payment of expenses in the year following expiration of the plan.

■ Having reached this conclusion, the Court must next consider how the determination of "reasonably necessary" expenses should be made and, as pertains to the instant case, what expenses are "reasonably necessary" for continuation of the debtors' farming operations so as to be excepted from the calculation of disposable income upon completion of their Chapter 12 plans. As stated in *Coffman*, the determination of disposable income must be made on a case by case, factual inquiry basis upon examination of the totality of circumstances in each instance. This inquiry will necessarily be somewhat subjective; however, the operative guide is one of reasonableness, and the necessity of particular expenses proposed by the debtors must be analyzed according to this standard. *Coffman.*

The debtors here seek to use income generated during the last year of their plans to pay the entire cost of planting, maintaining, and harvesting their next year's crop following completion of their plans. They assert that this is "reasonably necessary" for the continuation of their farming operations, first, because they are unable to borrow the necessary funds from another source and, second, because they would be unable to afford large interest payments on such an operating loan. Both debtors testified that their farming operations could not survive financially if they had to get a large loan for operating expenses and then had a bad farming year. The debtors point out that during pendency of their Chapter 12 plans, they used income from one year's crop to pay the next year's crop expenses without objection from the trustee or unsecured creditors. They argue, moreover, that they should not be required to borrow money to continue farming after expiration of their Chapter 12 plans any more than a Chapter 13 debtor coming out of bankruptcy would be re-

quired to borrow money to pay his next month's expenses.

Before taking up the debtors' arguments, the Court notes that it is the purpose of bankruptcy relief generally to give debtors a "fresh start"—not to ensure their success in post-bankruptcy endeavors. Specifically, Chapter 12 was designed to give farmers a "fighting chance" to reorganize their debts, not to leave Chapter 12 debtors in an advantageous position relative to other farmers. A Chapter 12 debtor, therefore, should not be allowed to profit from the experience, but should be placed on an equal footing with other farmers upon successful completion of his plan.

■ While no provision of Chapter 12 requires a farm debtor to borrow money for crop production either during the term of his plan or afterwards, the obtainment of a yearly operating loan secured by that year's crop is common practice among farmers generally.[3] Like other persons in business, the farmer must often borrow the capital necessary to produce goods that will be sold to generate a profit, with the interest costs being deducted from that profit as part of the farmer's overhead expenses. Because the necessity and feasibility of borrowing depend upon an individual farmer's cash flow situation, no *per se* rule may be stated as to whether a farmer who has availed himself of Chapter 12 protection should be required to borrow the funds to produce his crop following bankruptcy in order to meet the disposable income requirement of § 1225(b)(1). This question is, rather, part of the "reasonably necessary" inquiry to be determined based upon the facts of a particular case. *See Coffman.*

The debtors' analogy to the Chapter 13 debtor is faulty and unsupported by authority. While they assert that no Chapter 13 debtor would be required to borrow money upon completion of his plan, the debtors cite no authority for this assumption. Here, again, the question is one of "reasonable necessity," and the Chapter 13

**3.** In lieu of a single loan from a bank or governmental lending institution, the farmer may also obtain credit from suppliers who wish to sell him fuel, seed, fertilizer and chemicals necessary to produce a crop.

debtor would be allowed to retain only that income reasonably necessary for living and business expenses, while being "required" to borrow any amounts he wished to spend in excess of that. 11 U.S.C. § 1325(b).[4]

■ The debtors' income and expense projections in the instant case provided for the retention of income in the first year of their plans to pay crop expenses for the succeeding year. Both of the debtors were able to use income from their 1987 crop to fund their plans initially.[5] The debtors then used 1988 crop income to pay 1989 crop expenses with no objection by the trustee or unsecured creditors that such amounts constituted disposable income.[6] This failure to object during the first two years of the plans, however, does not preclude the trustee and unsecured creditors from filing such an objection at the expiration of the debtors' plans. It is entirely consistent with the objective of Chapter 12 to allow for "priming the pump" from income produced during the debtors' plans, and the debtors' use of plan income in the first two years of their plans to pay the succeeding year's crop expenses was presumably necessary to make their plans work. It does not follow that the debtors must continue this practice for the crop

year following expiration of their plans, and the trustee's objection on the grounds of reasonable necessity is appropriate at this time.

■ At hearing on the objections of the trustee and unsecured creditors to the debtors' motions for discharge, debtor Bowlby testified that he withheld $100,000 from his 1989 income before sending the balance to the trustee for plan payments and payments to unsecured creditors. Kirchner likewise testified that he prepaid approximately $59,000 worth of 1990 crop expenses out of 1989 income and that he retained $15,000 worth of equity in a stored bean crop from 1989, as well as 2,200 to 2,300 bushels of corn stored on his farm. He further stated that he had a bank balance of $23,000 at the end of December 1989. Kirchner submitted no amounts to the trustee for payment to unsecured creditors.

The debtors contend that in addition to this showing that the debtors withheld substantial amounts of plan income in 1989, the trustee and unsecured creditors were obligated to prove that the amounts withheld from 1989 income were not reasonably necessary for continuation of their farming operation in 1990. Having no direct au-

4. The unique nature of farming, with its yearly income and expense cycle, makes the situation of the Chapter 12 debtor different from the typical wage-earning Chapter 13 debtor. See 5 Collier on Bankruptcy, § 1225.04, at 1225–28. It has been suggested that, because of this difference, the Chapter 12 debtor wishing to retain a "reserve" from his income during one year to finance the subsequent year's crop might be allowed to do this providing he extend the period of his Chapter 12 plan to ensure that unsecured creditors receive the disposable income to which they would be entitled in the absence of the reserve. See the example set forth in Collier's, where the author notes: "Because of the reserve [to be used for the next year's crop], the debtor is not fulfilling the net disposable income requirement [of § 1225(b)(1)]." Id., at 1225–28 to 1225–29. The suggested solution would work only if the debtor's projections of disposable income made at the beginning of the plan period proved to be accurate. In the instant case, while Kirchner proposed to pay unsecured creditors over $10,000 in the first year of his plan, he actually paid them nothing during the entire plan, and a prolonged payment period would have made little difference.

5. Bowlby received a waiver of crop liens on his 1987 crop from two creditors and granted a third creditor, FHA, a "rolling" lien on future crops so as to be able to use the 1987 crop income to fund his plan. FHA is being paid through Bowlby's Chapter 12 plan. Kirchner was able to plant his 1987 crop by use of 1986 crop income and post-petition loans from his relatives. The 1986 crop lien claimants and the post-petition lenders were paid through his Chapter 12 plan, and there is no lien on his 1990 crop. In both cases, the debtors were able to operate during the period of the plans with no further borrowings.

6. The Coffman case set forth a procedure by which the trustee would review the debtor's financial statements at the end of each year and recommend a specific amount for distribution to unsecured creditors as disposable income. If the trustee and debtor were unable to agree or if the unsecured creditors had an objection to the amount agreed upon, they could challenge the distribution or lack thereof under 11 U.S.C. § 1229(a)(1). See Matter of Schwarz, 85 B.R. 829 (Bankr.S.D.Iowa 1988).

thority regarding the applicable burden of proof in a Chapter 12 discharge hearing, the Court finds instructive the allocation of burdens of proof in the context of objections to confirmation based on failure to comply with the disposable income requirement. The court in *In re Fries*, 68 B.R. 676 (Bankr.E.D.Pa.1986), a Chapter 13 case, discussed the principles involved in determining the correlative burdens of production and persuasion. The court found that once the objecting creditor has satisfied his initial burden of producing satisfactory evidence that the debtor is not applying all of his disposable income to his plan, the ultimate burden of persuasion rests with the debtor to show that all disposable income is being submitted toward plan payments. The *Fries* court noted that assigning the burden of persuasion to the debtor makes policy sense because detailed knowledge of income and expenses is peculiarly within the debtor's possession.

In the instant case the debtors, not the trustee, were in the best position to offer income and expense projections for 1990 to support their claim that they could not afford the interest payments on an operating loan to produce their 1990 crop. While the debtors testified as to the dollar amount they would need to plant and harvest their 1990 crop, they produced no evidence to show their expected income in 1990 or to show how an operating loan would affect their overall cash flow. The debtors merely proffered the self-serving statements that their farming operations would not survive if they were forced to borrow for payment of production expenses and then had a bad farming year. The Court is aware that the projection of farm income is necessarily tenuous because of the many factors affecting both the price and yield of the farmer's crop. However, any analysis to determine whether retention of plan income is reasonably necessary for production of next year's crop would be incomplete without information showing the debtors' expected income for the coming year and how the cost of borrowing would affect their net return.

The Court further finds insufficient the debtors' testimony regarding their inability to obtain operating money from another source to produce their 1990 crop. Debtor Bowlby stated that he telephoned two banks in the area to inquire about the possibility of a loan for the full amount of his projected expenses. He made no request for a partial amount and did not offer the banks a secondary security interest in his crop to the extent its value exceeded the amount of the FHA's lien.[7] Bowlby did not furnish the banks with a financial statement or visit the banks in person to discuss his situation. While Bowlby may indeed be unable to obtain an operating loan in any amount because of the FHA's first lien on his crop, evidence of his feeble attempt to obtain such a loan is insufficient to sustain his burden of proof.

Debtor Kirchner testified that, despite the fact that his 1990 crop is unencumbered by other liens, the bank officer he contacted refused to loan even part of the funds he would need for 1990 crop expenses. Neither Kirchner nor Bowlby stated whether they had sought to obtain credit from a farm supplier in the business of selling fuel, seed, fertilizer and chemicals. It is not improbable that such a supplier would be willing to furnish supplies to Kirchner on a credit basis in exchange for a first lien on his 1990 crop.

While the Court is cognizant that it is requiring the debtors to "prove a negative" —that they are unable to obtain financing at a rate that would be feasible based on their cash flow projections for 1990—they are in the best position to show that they have explored the possibility of producing their 1990 crop without the use of plan income acquired at the expense of their prepetition creditors. The debtors must make this showing in order to comply with

---

7. The Bowlbys' Chapter 12 plan provided that the FHA would have a lien on future crops in the amount of $100,000. At trial, Bowlby stated that the FHA had a $120,000 lien on his 1990 crop. No explanation has been made of the reason for this discrepancy. Since no evidence was presented as to the projected value of Bowl-by's 1990 crop, it is unclear whether the debtor would have equity in his crop beyond the value of the FHA's lien. The Court notes that despite the FHA's prior lien on Bowlby's 1990 crop, a current year crop financer may be entitled to a superior lien under Ill.Rev.Stat., ch. 26, ¶ 9–312(2).

the disposable income requirement of § 1225(b)(1) that they submit all income not "reasonably necessary" to their farming operations to unsecured creditors. The Court finds that debtors Bowlby and Kirchner have failed to sustain their burden of proof in this regard.[8] The Court, accordingly, sustains the objection of the trustee and Farm Credit to the debtors' motions for discharge under Chapter 12.[9]

IT IS ORDERED that the objection to the debtors' motions for discharge filed by the Chapter 12 trustee and Farm Credit is SUSTAINED.

---

8. The Court places no credence in the testimony of the retired banker called by the debtors as an "expert witness" on their behalf. Mr. Taake's opinion that "no bank in southern Illinois" would make a loan to the debtors was, like other evidence presented by the debtors, conclusionary and without objective basis.

9. Because the issues raised in this case are novel, equity compels that the debtors be given an additional opportunity to demonstrate what portion of their income is "reasonably necessary" to their farming operation. Debtors are cautioned, however, that such a showing must present credible evidence on this issue. The debtors' prior presentation leaves the Court unconvinced that they made a sincere effort to secure financing. Their efforts appear to be nothing more than a feeble attempt to bolster their case before the Court. Let debtors be warned that the Court will not hesitate to hold that none of the accumulated funds are "reasonably necessary" should the debtors continue their charade. The Clerk will schedule a further hearing at the debtors' request and as the docket permits.