**In re Gail M. WOOD and Twila W. Wood, dba Wood Wheat Farms, Debtors.**

**Bankruptcy No. 87–02256.**

United States Bankruptcy Court, D. Idaho.

Dec. 11, 1990.

Brent T. Robinson, Ling, Nielsen & Robinson, Rupert, Idaho, for debtors.

Daniel C. Green, Racine, Olson, Nye, Cooper & Budge, Pocatello, Idaho, for Eastern Idaho Production Credit Ass'n.

Craig W. Christensen, Jones, Christensen, Jorgensen, Robinson, Holmes & Robinson, Pocatello, Idaho, for trustee.

L.D. Fitzgerald, Pocatello, Idaho, trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

*Introduction.*

The Court has under advisement a Motion to Modify Plan filed in this Chapter 12 case by the Trustee, Mr. Fitzgerald. Debtors' plan was confirmed in January of 1988, and has been the subject of two uncontested modifications sponsored by Debtors. Debtors have recently completed the last of their "sum certain" payments to Trustee for the benefit of their creditors under the terms of the plan.

From the record, it appears the motion was originally filed when Trustee discovered from Debtors' financial reports that they had liquidated approximately $80,000 worth of stored grain. The object of the motion initially was to obtain the Court's declaration that the grain proceeds were "disposable income" as defined in Section 1225(b) of the Code, and to secure an order that the funds be paid to Trustee for distribution to creditors. However, as the proceedings on Trustee's motion evolved, the scope of the inquiry became increasingly broad, all with the consent of the interested parties. Trustee now seeks to comprehensively examine Debtors' entire financial performance during the plan. While it is now apparent that the grain sold by Debtors was subject to a correspondingly large Commodity Credit Corporation secured loan obligation, so that Debtors netted relatively little in the transaction, Trustee has now identified literally hundreds of thousands of dollars in other monies he claims represent disposable income which must be paid to creditors.

The evidentiary hearing on the motion was conducted in several different sessions over a period of five months. Hundreds of pages of financial and other documentary exhibits were introduced into evidence, and what first appeared to be a simple case has taken on major dimensions.[1] Of course, Debtors' position is that there was and is no disposable income which should be paid to Trustee. In essence, they claim all funds they received have been reasonably expended for the continued operation of their farm, and that any funds currently on hand are required for their future business and living expenses.

In addition, the major secured creditor in the case, Eastern Idaho Production Credit Association (EIPCA), has opposed Trustee's motion. EIPCA supports Debtors' claims that no disposable income exists and decries any attempts to pay any funds to unsecured creditors at the risk of the failure of Debtors' business, and their resulting inability to service the EIPCA loan.[2]

Debtors explain that their plan was originally financed through an agreement with EIPCA which allowed them the use of 1987 crop proceeds and government payments amounting to about $105,000, subject to an EIPCA security interest, in connection with their 1988 operation. EIPCA agreed to repayment of its loans, thereafter to be secured by liens on basically all Debtors' assets, over a seven year period. This then

---

1. It must be wondered whether the issues here justified the thousands of dollars in legal and other expenses incurred by the parties, especially when it is so clear that even if there were a substantial amount of disposable income that should have been paid to Trustee, Debtors do not have the current resources to contribute further to the plan.

2. While EIPCA is obviously an interested party in the case and entitled to be heard on the issues raised by the motion, its participation added little substance to the resolution of these questions. The confirmed plan provides that disposable income shall be paid to the Trustee for distribution to unsecured creditors. See Chapter 12 Plan, Article XVI, p. 14. EIPCA is clearly bound by such provision, Section 1227(a), and therefore the disposition of any monies representing disposable income is not open to question.

allowed Debtors through their dry farm operation to make annual payments through the Trustee to other creditors, including a token small annual sum to be shared by unsecured creditors.

Debtors claim that their plan operation was "bare-bones" from the start, cutting back severely on such important operating items as fertilizer, equipment, and repairs. Additionally, Debtors claim that drought, insect infestations, and market conditions impaired their performance, at least during the first two years of their three year plan.

*Procedure.*

Trustee brings his disposable income arguments to the Court via a Motion to Modify. That is, when he discovered what he felt was the existence of additional disposable income available for distribution to creditors, he filed a Motion to Modify the confirmed plan, pursuant to Section 1229(a), seeking to incorporate a new specific payment requirement. This procedure appears to be consistent with the suggestions of other bankruptcy courts examining the issue of the proper approach for submitting disposable income issues to the Court, a question left unanswered by the Code or legislative history. *See, e.g., In re Schwarz,* 85 B.R. 829, 832 (Bankr.S.D.Iowa 1988).

 The confirmed plan in this case contains the following provision:

"All disposable income not used for the farming operation shall be paid to the trustee and the trustee may, at its discretion, use said disposable income for purposes of making additional payments to unsecured creditors during the term of the plan."

Chapter 12 Plan, Article XVI, p. 14. Under authority of Section 1225(b)(1)(B), such a provision is almost uniformly required by Chapter 12 trustees in this district as a part of any proposed plan.[3] In light of such a plan provision, must the trustee seek a modification to the plan to compel the Chapter 12 Debtors to pay over disposable income to him?

The answer to this question is quite clearly that no plan modification is necessary. The plan provision cited above places an affirmative duty on the Debtors to make the required payments. If they fail to do so, they risk dismissal based upon their default, Section 1208(c)(6), and will not be entitled to a discharge of indebtedness, Section 1228(a). The trustee, in satisfaction of his duties under the Code, must ensure that the debtor makes all payments required by the plan, Section 1202(b)(2), and oppose entry of discharge if good reason exists, Section 1202(b)(1). The debtor is required by the U.S. Trustee to file monthly financial reports with the Chapter 12 trustee during the term of the plan, and to file a final account of the administration of the estate, Section 1203.[4] In this manner, the trustee will be able to review the debtor's performance and seek either dismissal or denial of discharge if all disposable income has not been paid over.

At oral argument, the parties to this action agreed that modification of the plan was not the proper procedure to reach the issues at bar. They instead desire a declaration by the Court as to whether any disposable income exists, and if so, the amount. Since the parties have raised no objections to this procedure, the Court feels it appropriate to make such determinations. The consequences that may flow from such a decision must, however, be left to further proceedings.

---

**3.** The statute, Section 1225(b)(1), requires projected disposable income to be paid into a plan only if the Trustee or an unsecured creditor objects, or the plan proposes payment in full of creditor claims. Since full payment plans are rare indeed, the Court cannot easily envision a situation in which the prudent trustee would not interpose the statutory objection since confirmation is based on the debtor's untested estimates of income and expenses with all the attendant uncertainties.

**4.** To the Court's surprise, the local office of the U.S. Trustee has not required a final accounting from Chapter 12 debtors, relying instead on information in the monthly reports. While monthly reports are certainly helpful, the annual report would allow examination of debtors' transactions from a broader perspective and should be vital in allowing interested parties, including trustees, to take a position on debtors' overall compliance with plan terms.

*Burden of Proof.*

■ When disposable income issues do arise in a case, the courts have taken different positions with respect to the allocation of the burden of proof. The courts that require a modification motion to be prosecuted by the trustee also place the burden of proving there is indeed disposable income on the trustee. *See In re Coffman,* 90 B.R. 878, 885 (Bankr.W.D.Tenn. 1988); *In re Rott,* 94 B.R. 163, 167 (Bankr. D.N.D.1988); *Farm Credit Bank v. Hurd,* 105 B.R. 430, 432 (W.D.Tenn.1989). In the rehabilitative chapters, generally the burden of proving cause for dismissal rests on the moving party, and such has been held to be the case in a Chapter 12 case. *In re Jessen,* 82 B.R. 490 (Bankr.S.D.Iowa 1988).

Placing such a burden on the trustee in disputed disposable income cases is inconsistent with the Code, in the opinion of this Court, however. As indicated, it is the duty of the Chapter 12 debtor to make all plan payments and to demonstrate its eligibility for discharge. Likewise, the debtor is in the best position to assemble and present financial and other information about its operation, past and future, which is central to making the disposable income determination. While it is certainly consistent with the trustee's duties to require that he initiate an action to examine a debtor's disposable income, and to go forward with some evidence of the existence of such funds,[5] the ultimate burden of persuasion should fall squarely upon the debtor. This Court would therefore adopt the reasoning of those bankruptcy courts that have so held as being the better reasoned approach. *See In re Kuhlman,* 118 B.R. 731, 737 (Bankr.D.S.D.1990); *In re Bowlby,* 113 B.R. 983, 991 (Bankr.S.D.Ill.1990).

*Defining and Calculating "Disposable Income."*

No Chapter 12 plan may be confirmed by the Court, over the objection of a trustee or unsecured creditor, unless:

the plan provides that all of the debtor's projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1225(b)(1)(B). Congress first adopted an "ability to pay test" in connection with confirmation of Chapter 13 plans as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353. The Chapter 12 version of the test, Section 1225(b), enacted in 1986, is nearly identical to the Chapter 13 provision, Section 1325(b). Therefore, most courts have confidently relied upon Chapter 13 decisional authority for guidance in construing Section 1225(b). *See In re Kuhlman,* 118 B.R. 731, 735 (Bankr.D.S.D.1990); *In re Bowlby,* 113 B.R. 983, 988 (Bankr.S. D.Ill.1990); *In re Young,* 103 B.R. 1021, 1022 (Bankr.S.D.Ind.1988); *In re Coffman,* 90 B.R. 878, 883 (Bankr.W.D.Tenn.1988); *In re Schwarz,* 85 B.R. 829, 830–31 (Bankr. S.D.Iowa 1988). "However, because of the unique nature of farming, the disposable income requirement presents issues in chapter 12 that arise only infrequently in chapter 13 cases." 5 L. King, Collier on Bankruptcy, ¶ 1225.04 (15th ed. 1990).

■ While the "best interests of creditors" test will ensure that unsecured creditors receive at least as much through a confirmed plan as they would receive were the debtor's estate liquidated under Chapter 7, Section 1225(a)(4), the "disposable income" requirement serves a separate and distinct purpose. *In re Willingham,* 83 B.R. 552, 553–54 (Bankr.S.D.Ill.1988); *In re Borg,* 88 B.R. 288, 291–2 (Bankr.D.Mont. 1988); *In re Rott,* 94 B.R. at 167; *In re Kuhlman,* 118 B.R. at 736. Without regard to what creditors would receive in a liquidation setting, if a Chapter 12 debtor has the ability because of current income generated during the plan to pay the claims of unsecured creditors without jeopardizing

---

**5.** In a Chapter 13 setting the trustee or objecting party has been held to bear the burden of "going forward" with evidence of disposable income. *See Education Assistance Corp. v. Zellner,* 827

F.2d 1222 (8th Cir.1987); *see also* 5 L. King, Collier on Bankruptcy, ¶ 1325.08[2] (15th ed. 1990).

his reorganization effort, the debtor should be required to do so. Otherwise, a debtor with little or no realizable equity in its assets could unjustly deprive creditors of the income enjoyed under a successful plan.

 The plan in this case contains a "disposable income" clause. The fundamental issues therefore involve defining this term, and having done so, making the necessary calculations to determine if any such funds exist. The Code defines disposable income as follows:

§ 1225. Confirmation of Plan.

. . . . .

(b)(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor; or

(B) for the payment of expenditures necessary for the continuation, preservation, and operation of the debtor's business.

However, the statutory definition is expressly limited to the "purposes of this subsection." Section 1225(b)(2). The subsection to which it refers, Section 1225(b), expresses a condition of confirmation of the plan. That is, upon proper objection by the trustee or an unsecured creditor, the proposed plan must provide that all projected disposable income be distributed during the term of the plan. Clearly, the definition in the statute is intended to provide guidance in fixing the level of payments at the outset of the plan when the debtor's income must be viewed in terms of projections rather than actualities.

 In this and similar cases, the issue may be considerably different, though, since the Court is asked to determine "after the fact" whether certain amounts of income that have been actually received by a debtor are "disposable." Should disposable income for plan confirmation purposes be computed differently than for purposes of compelling payments under a confirmed plan?

Additionally, in this case the plan requires that "all disposable income not used for the farming operation" be paid over to the trustee. If the statutory definition of disposable income is applied, this sentence could be construed to grant the debtor even broader rights to use income in the business operation. In other words, even if the income in question is "disposable" as defined by Section 1225(b)(2) (i.e., not reasonably necessary for debtor's support or for continuation, preservation, and operation of the business), the plan requires that it be turned over to the trustee *only* if it is "not used for the farming operation." This would seem to bestow a broad license upon Debtors to use the income, disposable or otherwise, so long as it is expended in connection with Debtor's farm business.

This discussion highlights an issue as to the proper source for the definition of, and duties with respect to, disposable income. While the interpretation of the statute and plan discussed immediately above is based upon the plain language of both, it has received no recognition in the case law. Virtually every decision on this subject defines post-confirmation disposable income exclusively with reference to Section 1225(b)(2). *See, e.g., In re Kuhlman,* 118 B.R. at 735; *In re Bowlby,* 113 B.R. at 987; *In re Coffman,* 90 B.R. at 881. No cases have been located which apply a different definition of disposable income for purposes of plan confirmation, as compared to a review of the issue at the conclusion of the plan, nor that have recognized any attempt by a plan itself to define this term.

Regarding this particular case, the parties have indicated their reliance on the statutory definition even if that varies with a literal interpretation of the language of the plan. The Debtors' plan also contains another provision which requires that in the case of a conflict between terms of the plan and provisions of the Code, that the Code provisions will control. Chapter 12 Plan, Article X, p. 10. The position of the parties therefore makes it appropriate that the Court rely on the statutory definition,

and reserve for future cases the disposition of the other definitional issues discussed above.

A related definition problem involves the period of time over which the relevant calculations and comparisons of income and expenses are to be made. Under Section 1225(b)(1)(B), the Court must ensure that "all of the debtor's projected disposable income to be received in the three year period . . . beginning on the date that the first payment is due under the plan . . ." will be paid to creditors. As an independent confirmation requirement, a debtor must compensate unsecured creditors for any unencumbered cash on hand at confirmation under the "best interests" test, Section 1225(a)(4), without regard to the proposed use for those funds.

The issue in the present case, though, is not confirmation, but whether Debtors actually have (or had) funds which constitute disposable income that should be paid to creditors under the plan. Under the statutory definition, this requires the Court to review income "received by the debtor" against amounts "reasonably necessary to be expended", Section 1225(b)(2). The three-year limitation, measured from the initial plan payment due date found in Section 1225(b)(1), is a confirmation standard and is not a part of the definition of disposable income. The Court therefore feels it essential to the proper operation of the statute to examine all income received by Debtors over the term of the plan commencing with the date of confirmation. The Court must have the liberty of taking into consideration monies received by Debtors during the plan term, even if those funds were received before the first plan payment date, or a potential for abuse of the Code is present. That is, frequently plans are confirmed which provide no payments to creditors for as much as a year. Debtor's preconfirmation income in the form of cash on hand will be evaluated as part of the "best interests of creditors' test" as of the effective date of the plan. However, if the Court is restricted to the initial plan payment date as a starting point in its disposable income analysis, a possibility exists that a debtor may receive otherwise disposable income and spend it without benefit to the creditors. There is no justification for creating such a "gap" in evaluating a debtor's responsibility to its creditors.[6]

In this case, the plan was confirmed on January 26, 1988, and the first plan payments were due on February 1, 1988, so the difference in time between confirmation and payment dates, and the amount of any income received, is likely inconsequential.[7] The plan establishes a term of three years, and therefore all income received by Debtors through January 25, 1991 should be considered in calculating disposable income.

With respect to expenses, however, the review required by the language of the Code mandates that the Court take into consideration not only those amounts expended by Debtors during the term of the plan, but also those amounts which will be required in the future for the continuation, preservation, and operation of the business. Section 1225(b)(2)(B). This point has sparked some debate, but the logic of this construction has been articulated in several decisions:

The specific reference in § 1225(b)(2)(B) to expenses necessary for the "continuation" of the debtor's business indicates that deductible expenses need not be restricted to those incurred

---

6. Assume, for example, a plan is confirmed in the spring based upon projected income from the coming farm season, with initial plan payments to be made after harvest and sale of the crops in the fall or winter. If, for some reason, the crop income substantially exceeds projections, should the otherwise available funds be denied to creditors under a restricted definition of disposable income?

7. Debtors argue that funds received from the sale of crops raised during 1987 should be excluded from the income calculations even though they may have been received post-confirmation. They suggest a modified "accrual" method of analyzing income is appropriate. Such approach is contrary to the "received by" language of the Code, Section 1225(a)(2), and is otherwise fundamentally unfair.

during the period of the plan. This provision, which contemplates the use of plan income to sustain the debtor's farming operation beyond a particular operating year, is in keeping with the objective of Chapter 12 to help farmers reorganize so that they may retain their land and continue farming. It cannot be seriously contended that Congress intended that a debtor's farming operation continue during the life of the plan but not beyond the period of the plan.

*In re Bowlby,* 113 B.R. at 988. This conclusion is consistent with those cases which allow Chapter 12 debtors to carry over income from one year to the next during the term of a plan. *See In re Coffman,* 90 B.R. at 885 (requiring all net income to be distributed each plan year to creditors would ignore the realities of farming).

█ In summary, then, while not necessarily the rule in interpreting all plans, in this case the Court will apply the statutory definition to disposable income. Under the statute, the Court may review all income received by Debtors after confirmation and during the plan, including those amounts actually received before the initial plan payment date. The expenses to be examined for possible deduction to arrive at disposable income, if any, will include all actual expenditures to the date of the analysis, together with any future proposed expenses that are reasonably necessary for the continuation of Debtors' farming operation, which may properly include expenses to be paid after expiration of the plan term.[8]

*Reasonably Necessary Expenditures.*

█ The language utilized in Section 1225(b)(2)(B) requires the Court to conduct a subjective analysis of a debtor's expenditures, actual and proposed, to determine if the expenditures are reasonably necessary. In doing so, the case law has uniformly adopted an examination of the "totality of circumstances" based upon the evidence presented. *In re Kuhlman,* 118 B.R. at 739. The determination must be made on a case by case basis, and represents a purely factual inquiry. *In re Coffman,* 90 B.R. at 883. As the court in *Coffman* instructed:

Overall, this must be an inquiry, both by the trustee and the court, into what is commercially reasonable under all the facts and circumstances. The debtor must not be permitted to evade the payment of disposable income by improper expenditures. However, this is not a simple cash flow inquiry. The Court is mindful that the debtors should not accumulate an unreasonably large reserve of funds which could be a windfall at the time of discharge. Neither should the debtors be unreasonably hindered from reaching their reorganizational goal.

90 B.R. at 886 (citation omitted).

Two aspects of this factual inquiry which frequently generate controversy are: (1) whether capital expenditures are "reasonably necessary" as contemplated by the statute; and (2) whether a Chapter 12 debtor should be required to obtain operating credit, rather than use available cash to carry on the farm business. In each regard, the particular facts of a case will dictate the answer.

█ Contrary to Trustee's assertion, capital expenditures are not "unreasonable" as a matter of law.[9] In this case, the Debtors' plan budget contains a specific reference to the need for annual capital expenditures to replace worn equipment. While such expenditures should therefore

---

**8.** By its holding, the Court is not suggesting that the only appropriate stage in a case at which the "disposable income" issue may arise is at or near the conclusion of the plan term. One case suggests that such an analysis be conducted at the end of each plan year. *In re Schwarz,* 85 B.R. at 832. Most accurately, a disposable income issue may arise at any time during the plan term. Whenever it is raised, though, the approach to calculating the existence of any disposable income should be identical.

**9.** Trustee makes too much of the holding of this Court in the early Chapter 12 decision, *In re Hevner,* 87 I.B.C.R. 249. There a Chapter 12 debtor proposed substantial increases in its farming operation, including acquisition of a series of new farming and irrigation equipment. This Court reads *Hevner* as simply prohibiting the capital expenditures in question under the facts of that case.

come as no surprise, the propriety of any capital expenditures in this case, budgeted or otherwise, is simply a question of fact as to their reasonable necessity.

■ Likewise, whether it would be reasonable to require an emerging reorganized Chapter 12 debtor to seek an operating loan or credit from its suppliers, and thereby free up cash on hand for distribution to unsecured creditors, is also a function of the facts of each case.[10] *Coffman,* 90 B.R. at 886; *Bowlby,* 113 B.R. at 989; *Kuhlman,* 118 B.R. at 736. Annual operating credit is commonplace among farmers. If indeed a Chapter 12 plan has been successful, the reorganized debtor may have retired substantial debt and be in a position to deserve and be able to obtain credit. In such cases, this Court feels that the Code would require that the credit be accepted.

> [I]t is the purpose of bankruptcy relief generally to give debtors a 'fresh start'— not to ensure their success in post-bankruptcy endeavors. Specifically, Chapter 12 was designed to give farmers a 'fighting chance' to reorganize their debts, not to leave Chapter 12 debtors in an advantageous position relative to other farmers. A Chapter 12 debtor, therefore, should not be allowed to profit from the experience, but should be placed on an equal footing with other farmers upon successful completion of his plan.

*In re Bowlby,* 113 B.R. at 989.

*Disposition of the Issues.*

Applying the above rules of law to the facts of this case is no small challenge.

The parties have deluged the Court with numbers derived from a variety of sources, but for the most part the calculations are taken from Debtors' budgets (both the plan budget and subsequent annual budgets), their tax returns, and their monthly financial reports. Certain general observations are in order before dealing with specific data, however.

First of all, Trustee has questioned the accuracy and credibility of much of the financial information presented by Debtors. After listening to several days of testimony, especially that of Mrs. Wood, the Court confidently concludes that there have been no deliberate attempts to manipulate the information, secrete assets or transactions, or to be intentionally incorrect in the Debtors' financial reports.

This is the classic family farm operation with Mr. Wood having responsibility for the production activities, with help from the parties' sons as part-time labor. Mrs. Wood is almost solely responsible for all accounting duties. Clearly in the past the farm financial records were not kept with as much attention to minute detail as is demanded by the bankruptcy reporting requirements. However, the Court finds that Mrs. Wood in particular has made a good faith effort to be accurate and truthful in the reports, and any errors or omissions were not intentional and largely inconsequential when considered in the Court's overall analysis.[11]

■ Next, as discussed above, the Court is chiefly concerned with income actually received by Debtors during the plan term, and a comparison of that income to

---

**10.** The Court respectfully disagrees with the reasoning of *In re Young,* 103 B.R. 1021, 1022 (Bankr.S.D.Ind.1988), wherein as a matter of definition, the Court finds disposable income to exclude that which "is reasonably necessary to pay the upcoming year's expenses *without obtaining credit."* There is nothing in the Code or its legislative history which would require such a broad rule, and *Young* is the only case of its kind, according to the Court's research. Surely facts can be supposed which would compel a Court in good conscience to require a debtor to take advantage of available loans, if they could be reasonably obtained and afforded.

**11.** Trustee's microscopic examination of Debtors' financial records of income and expenses

causes him to claim there is over $218,000 in disposable income which should be distributed. However, in his review, all doubts have been resolved against Debtors on any arguable items, and his approach is extreme. For example, his disposable income calculations include non-cash items, such as a $10,411 "depreciation deduction" and a $14,522 "net operating loss carryover," and a variety of small dividends earned by Debtors, but not actually received on insurance and annuities. Much of the disparity focused upon by Trustee stems from his heavy reliance on budget and tax return figures, instead of actual receipts and disbursements.

actual expenditures and projected necessary future expenses. The various budgets admitted into evidence and relied upon by the parties in their presentations are of limited utility in this analysis. The initial budget plays a vital role at the plan confirmation stage in connection with feasibility and disposable income issues. Additionally, the current projection of future expenses is necessary for this proceeding. All other intervening budgets, however, should be regarded as relevant, but by no means as dispositive information. These annual budgets are helpful to the trustee to gauge the extent and potential success of a debtor's operation, but it is actual income and expense figures which will always dictate the outcome of subsequent disposable income analyses. Budgets are merely educated guesses and the fact that Debtors' operation varied from the budget may or may not be important in light of the facts of the case.

 Tax returns are also difficult to reconcile with the bankruptcy financial reports for a variety of reasons. Differences in accounting approaches may result in a wide divergence when comparing returns with cash transaction reports. Frequently, tax returns reflect many noncash transactions or items, both from an income and expense perspective. Because of these concerns, the Court has relied most heavily on those exhibits reflecting Debtors' actual performance based upon a cash method of accounting.

 Turning to the specific facts of this case, evidently Debtors' income is generated primarily from two sources: (1) crop sale proceeds, including recoveries from various crop insurance programs in disaster loss situations, and (2) federal farm program payments, which are principally grain deficiency and conservation reserve program payments. At confirmation, Debtors had access to approximately $105,000 in cash and crops on which to operate as a result of their agreement with EIPCA. After nearly three years, and based upon the most current information, this fall they had access to approximately $80,000 in cash and unsold 1990 crops. They have, of course, already begun the planting of their 1991 grain crops, and will also have access to substantial government program payments, depending upon the final details of future federal farm support policies.[12]

All the evidence presented by the parties leaves the Court unable to identify any specific expenditures during the term of the plan that could not be classified as "reasonably necessary" as those terms are used in Section 1225(b). Debtors repeatedly demonstrated the austerity of their operation. For example, during the term of the plan they approached and negotiated a reduction in secured plan payments to Ruby Mackay on her land contract. Debtors sold items of equipment subject to liens to reduce annual payment requirements. They even obtained formal permission of the Court to use $600 in tax refunds because of their needs. Trustee did not object to any of these steps by Debtors.

 During the term of the plan, Debtors also experienced an infestation of both grasshoppers and wheat aphids which impacted yields. And, the drought conditions of one season were such that Debtors had literally no crop in some fields. While a certain amount of natural adversity must be expected in Debtors' business, the extent of these calamities is enough to justify substantial additional operating costs (such as for chemicals) and significant decreases in income. In spite of these problems, Debtors have been able to make the payments to Trustee as provided in their plan.

Debtors' budget-cutting approach has had predictable adverse consequences also. By cutting back on fertilizer costs, for instance, Debtors have run the risk of long-term damage to the productivity of their soils. By postponing routine equipment repairs, the inevitable mechanical problems have become proportionately more expensive to correct. This approach to manage-

---

12. Given the growing concerns with the federal budget deficit, it is fair to assume farm program payments will likely decrease, rather than increase, in coming years.

ment is not exemplary [13], but it has allowed Debtors to stay in business during lean years. In more recent years, because income has approached more acceptable levels, Debtors are now forced to defend their increased expenditures and budget items for chemicals, fertilizer, repairs, and such.[14]

Also, the Court can find no fault with any capital expenditures made by Debtors during the course of their plan. The plan was confirmed with a budget of $5,000 per year for such purchases, and Debtors have expended approximately this same amount in the aggregate over their plan term. While simply including a budget item for capital expenditures does not insulate those transactions from review, the individual expenditures here appear reasonable, in light of the extent of Debtors' operation.

The Court finds that based upon the evidence, including Debtors' projections, Debtors will require all of their current cash and 1990 crop proceeds and government payments to fund their on-going farm operation and living expenses, and to make their EIPCA and other secured debt payments. Realistically, even assuming Debtors do not experience any of the kinds of natural catastrophes they have recently suffered, they would be unable to devote any income to payment of unsecured debt until after EIPCA's claim is paid. Even so, they are now effectively $20,000 in arrears in payments to Mrs. Mackay, and are likely to need substantial capital expenditures in the near future. If Debtors are required to turn over current cash and crops to Trustee, the likely result would be another bankruptcy filing, frustrating Debtors' reorganization efforts.

Because of this state of affairs, it is also unrealistic to expect Debtors to be able to qualify for any sort of commercial operating credit. Although they made no actual loan applications, the Court is satisfied from the testimony of the witnesses that because the Woods lack the ability to grant a lender a priority lien on their personal property assets, such as crops and equipment, they lack an essential ingredient to obtaining credit. In addition, Debtors' projected margin of expenses to income (even without regard to any expense for any new loan interest) would place an operating lender in an extremely precarious position. Even assuming a new lender would embrace a creditworthy Chapter 12 farm operation, something which is less than clear, this does not appear to be such an operation. Debtors seem now to actually have less in available operating assets than they did when they embarked upon their plan.

It is argued that, in effect, the unsecured creditors have involuntarily financed this operation by being deprived of Debtors' current income. When the EIPCA debt is finally paid, and the Mackay debt is current, and operating and capital needs of the farm are accommodated, Debtors will eventually have approximately $80,000 to $105,000 in funds which could be paid to those unsecured creditors. However, in the Woods' case, such financial conditions will not be achieved this year, over the next two years, or nor likely even over a longer period.

Congress mandated three to five year Chapter 12 plans, Section 1222(c), at the conclusion of which remaining unsecured debts are discharged, Section 1228(a). The Court in this case confirmed a three year plan. If Debtors, through their plan, could have restructured their debts to such an extent within the plan term to generate income not reasonably necessary for anticipated business and living expenses and

---

**13.** In fact, if such an operating method were known to the Court and parties and contested at confirmation, the plan would not likely be confirmable under Section 1225(a)(6), the "feasibility" test. It is, however, inappropriate to question Debtors' methods at this stage of the proceedings.

**14.** Trustee contends that Debtors have "systematically spent any and all revenues...." Trustee's Post–Trial Brief at 11. While this characterization incorrectly suggests sinister motives, it is basically true. However, as Debtors explain, when funds became available, they would be injected into the operating budget, largely because their original projections were unrealistically low.

plan payments, they could have been com-
pelled to pay the extra income to unsecured
creditors.[15] However, the creditors and
Trustee cannot legitimately complain that
Debtors do not realize any disposable in-
come, if at all, until after expiration of the
plan term without inviting the Court to
rewrite the statutes. The Court will de-
cline such invitation here.

*Conclusion.*

The Court finds as a matter of fact that
Debtors have realized no disposable in-
come, as of the date the hearings in this
matter were concluded, which should be
paid to unsecured creditors under the
terms of their confirmed Chapter 12 plan
or applicable law as interpreted above.
Trustee's motion will therefore be denied
by separate order. This Memorandum
shall constitute the Court's findings of fact
and conclusions of law. Bankruptcy Rule
7052.

---

**15.** In such a case, Debtors could still access the
income for operating needs by simply proposing
an extension to their plan term. See 5 L. King,

Collier on Bankruptcy, ¶ 1225.04, pp. 1225–28–
29 (15th ed. 1990).