**In re Floyd W. MEYER, Irma A. Meyer, Debtors.**

Bankruptcy No. 87–41521–12.

United States Bankruptcy Court, D. Kansas.

Oct. 25, 1994.

Lynn D. Lauver, Topeka, KS, for debtors.

Tanya Sue Wilson, Asst. U.S. Atty., Topeka, KS, for US/FMHA.

Eric C. Rajala, Trustee, Overland Park, KS.

## MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

This matter comes before the Court pursuant to the trustee's motion for termination of the Chapter 12 proceeding and for discharge of the debtors and trustee. Farmers Home Administration ("FMHA") objected on the basis that the debtors failed to pay all disposable income into the plan for distribution, that the debtors made unauthorized expenditures out of disposable income, and that the debtors spent more than $15,000 annually for family living expenses. A hearing was held on July 20, 1994, at which time the Court took the matter under advisement. Floyd Meyer and Irma Meyer ("debtors") appeared by and through their attorney, Lynn Lauver. FMHA appeared by and through Tanya Sue Wilson, Assistant U.S. Attorney. The trustee, Eric Rajala, appeared pro se.

### JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (O).

### FINDINGS OF FACT

Based on the parties' stipulations of fact and stipulated exhibits, including the deposition of Floyd Meyer, the Court finds as follows:

The debtors' Chapter 12 Plan was confirmed on June 9, 1988. The plan included a liquidation analysis showing that there would be no payment to unsecured creditors in the event of a liquidation under Chapter 7. The plan and confirmation order provided that all of the debtors' proposed disposable income to be received in the three year period of the plan would be applied to make payments under the plan. The Stipulation and Order for Adequate Protection of the Federal Land Bank of Wichita, filed May 12, 1988, was incorporated into the confirmation order by a nunc pro tunc order filed on June 17, 1988, and provides in pertinent part, that:

Debtors shall not expend more than $15,000.00 for any year of the plan for family living expenses. No prepayments of plan debts shall be made. No capital purchases over $5,000.00 shall be made without Court Order after notice to all creditors and opportunity for a hearing.

The disclosure statement attached to the debtors' plan indicated that the plan would be funded by income from several sources: rental of pasture, farmland, and a grain storage building; Floyd Meyer's civil service job at Fort Riley, Kansas; Irma Meyer's job in Manhattan, Kansas; Irma Meyer's craft store; and a hog feeding operation. However, the hog feeding operation never commenced. During their 36–month plan, the debtors' primary sources of income were their jobs in Fort Riley and Manhattan, 60–80 miles away from home. They also had a tenant renting all of their farmland and pasture as well as a grain storage building. For one year, the tenant leased the debtors' hog confinement facility, a structure that had cost the debtors $80,000 to erect. During the other two years, the hog confinement facility was idle, but the debtors maintained it in an operational state as they actively sought a tenant.

Nevertheless, the debtors' actual income during the plan greatly exceeded their projections. During the 36–month plan, their monthly reports to the trustee reflected a total of $211,760.18 in income.[1] They had

---

1. This figure includes proceeds of loans obtained by the debtors and "transfers" which represent monies from student loan checks issued to their children, which the debtors deposited into their account, but later remitted to their children.

projected annual income of $45,000. Their higher income is in part explained by the debtors' industriousness. Initially, they commuted long distances to work, 60–80 miles each way. Later, they obtained a second residence in Manhattan, allowing Floyd Meyer to obtain a second part-time job; they relied on their children to maintain the homestead and rental property while they were away.

The confirmation order restricted the debtors to $15,000 per year in living expenses. In 1988 and 1989, the debtors spent more than $15,000 per year. In 1990 and 1991, they spent less than $15,000 per year.[2]

The disclosure statement projected that the debtors' annual operating expenses would be $16,455, including: $3000 for "job related room rent"; $800 for upkeep and repair on their automobile and hog facilities; $450 for labor; and $2300 for transportation. Their actual operating expenses greatly exceeded their projections. They claimed total operating expenses of $138,679.31 during the 36-month plan period. Their actual operating expenses included: fuel; repairs; improvements to property; supplies; utilities; rent and other living expenses associated with their second residence in Manhattan; transportation and commuting; insurance; college education expenses of their son; and compensation paid to their son and daughter for maintenance and custodial work on the homestead, land and hog facility.[3]

Meyer attributed the higher expenses to their having to maintain two residences while also maintaining land and buildings for their tenants and the hog facility for prospective tenants. He testified that the hog facility was a particular drain on expenses, requiring electricity, water, and maintenance several times a week to keep it operational. As a consequence, the debtors paid their son to commute home several times a week from Manhattan to maintain the hog facility. The debtors also compensated their son and daughter for field work, repairing hog fences damaged by their tenant, and other custodial and maintenance work on the homestead and rental buildings.

It is impossible to ascertain what the debtors spent on these various operating expenses. In their monthly reports, the debtors batched, rather than itemized, their operating expenses. Thus, the Court cannot determine how much they spent for items such as fuel, transportation, labor, utilities, education, supplies and repairs. The most the Court can ascertain from their monthly reports is that they paid approximately $350 per month to rent their second residence. In addition, Floyd Meyer testified that either he or his son made several trips home each week to maintain the hog facility and farmland, which would have resulted in transportation costs associated with two or three 120-mile round trips each week.

Furthermore, the debtors' monthly reports cannot be reconciled with their tax returns. The expenses deducted on Schedule E, for rental and royalty income, relate only to operating expenses associated with rental of the land and buildings, but not expenses associated with maintenance of the idle hog facility, commuting, or their second residence.

During their 36-month plan, the debtors paid a total of $38,092.89 to the trustee. Their monthly reports reveal: a budget surplus of $413 in 1988; a budget deficit of $784.90 in 1989; a budget surplus of $181.14 in 1990; and a budget deficit of $4786.90 in 1991. No payments were made to unsecured creditors.

## CONCLUSIONS OF LAW

FMHA objects to discharge on the basis that the debtors have failed to contribute

---

2. During the seven months in 1988 that they operated under the confirmed plan, $8750 was the appropriate proportionate share of $15,000 that they should have spent, but they actually spent $10,540.89. In 1989, they spent $16,088.04, which was $1088.04 over their limit. In 1990 they spent $9346.37. In 1991 the appropriate proportionate share of $15,000 was $6250, and debtors spent $3988.24.

3. During the plan their son was 23–27 years of age and their daughter was 17–21 years of age. Both were dependent students who subsisted on student loans and money provided by their parents. Their daughter lived at home. With the exception of one semester, the son lived at his parent's residence in Manhattan, where he attended college.

their disposable income to the plan and have therefore failed to complete all payments under the plan as required by 11 U.S.C. § 1228. FMHA urges the Court to disallow several types of expenses, to wit: education expenses; expenses from operating the hog feeding facility; expenses for a second residence; and living expenses in excess of $15,000 per year. Moreover, FMHA urges the Court to calculate disposable income by relying on the income and expense figures in the debtors' tax returns, rather than the figures in their monthly reports.

■ Given the language in the confirmation order, the Court agrees that any living expenses in excess of $15,000 per year should be disallowed. The confirmation order unequivocally prohibits the debtors from spending more than $15,000 a year for "family living expenses." The debtors argue that this provision, which was a term in an order for adequate protection granted to the Federal Land Bank, was intended to benefit only the Federal Land Bank, not FMHA. However, the confirmation order was amended by a nunc pro tunc order filed 12 days later, which expressly incorporated the terms of the adequate protection order as terms of the confirmation order. The debtors, Federal Land Bank and FMHA were all parties to this nunc pro tunc order. Therefore, the debtors are bound by this provision that limits their family living expenses to $15,000 per year.[4]

■ The debtors incurred substantially more than $15,000 in annual family living expenses when the expenses for their second residence are taken into consideration. They characterized these as "operating" rather than "living" expenses, as these expenses were related to their employment 60–80 miles away from their homestead and rental property in Palmer, Kansas. FMHA pro-

tests that these expenses should have been subject to the $15,000 ceiling for family living expenses.

Although rent, utilities and subsistence associated with a second residence would ordinarily constitute living expenses, under these circumstances, the expenses should be treated as operating expenses. The expenses are directly related to production of income and were incurred as a consequence of the debtors having jobs in Fort Riley and Manhattan, a great distance from their primary residence. If the debtors did not have these jobs, they would not have incurred these expenses. But, they also would not have generated substantial income to fund their plan. Had the debtors stayed on the farm, and incurred no commuting or job related expense, they would have foregone the $106,674.15 in wages they earned over the 36 months of the plan. The plan would have lost substantial funding and the unsecured creditors would have received nothing.

■ Moreover, 11 U.S.C. § 1225(b)(2) provides that expenses reasonably necessary for the operation of the debtor's business are to be excluded from the computation of disposable income.[5] Although a Chapter 12 debtor's business is farming, the legislative history pertaining to § 1225(b)(2) suggests a broader definition of "debtor's business." The Conference Report provides in pertinent part that:

> The Conferees recognize that family farmers who are eligible for Chapter 12 may be involved in minor businesses not directly related to the farming operation. The Conferees intend that the term "debtors's business" in section 1225 include such businesses.

H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 50 (1986) U.S.Code Cong. & Admin.News 1986 pp. 5227, 5251. Thus, reasonably neces-

---

4. The debtors spent more than $15,000 on family living expenses in 1989 and more than the appropriate proportionate share of $15,000 during the seven months in 1988 that they operated under a confirmed plan. In 1990 and 1991, however, they spent less than the $15,000 ceiling. *See* Footnote No. 2.

5. Section 1225(b)(2) defines "disposable income" as

income which is received by the debtor and which is not reasonably necessary to be expended—
    (A) for the maintenance or support of the debtor or a dependent of the debtor; or
    (B) for the payment of expenditures necessary for the continuation, preservation, and operation of the debtor's business.

sary expenses arising from their commuting or residing away from home, in order to retain their jobs while managing their rental property, should be excluded from a computation of disposable income.

The debtors identify three types of expenses necessitated by their long distance employment. The first type consists of expenses for their residence in Manhattan, while the second consists of transportation expenses. Prior to renting the residence in Manhattan, sometime in 1988, the debtors commuted to work each day, 60–80 miles each way. After they rented the residence in Manhattan, they continued to commute home on weekends, and their son, who attended college in Manhattan and resided there with them, commuted home several times a week to take care of the homestead, rental property and hog facility. Debtors claim compensation they paid to their son and daughter for custodial and maintenance work on the homestead, land, buildings and hog facility, as a third type of expense arising from their employment situation. The children worked weekends and summers. The son also commuted home several times a week during the school year.

However, it is impossible to glean from the debtors' monthly reports what their expenditures were for the Manhattan residence, for commuting, or for labor. It appears that they paid $350 a month in rent on the Manhattan residence; but, the debtors have failed to identify with particularity their other expenses.

■ One objecting to termination and discharge must make a prima facie showing that the debtors have unremitted disposable income. FMHA showed a substantial discrepancy between the debtors' projected and actual income and expenses. The debtors protest that their plan indicated there would be little or no disposable income available to unsecured creditors and that they need pay no more to obtain a discharge.

■ Section 1225(b)(1)(B) requires as a condition precedent to confirmation that a plan either pay an objecting unsecured creditor the full value of its claim or fund the plan with all of the debtor's **"projected disposa-**

**ble income"** for three years. This language in § 1225(b)(1)(B) does not mean that a debtor who pays all projected disposable income into the plan is entitled to a discharge. To obtain a discharge, the debtor must pay all actual disposable income into the plan. The language in § 1225(b)(1)(B) sets forth the standard for confirmation; it does not prescribe the criteria for discharge.

■ Too much has been made of the use of the word "projected" in § 1225(b)(1)(B). If § 1225(b)(1)(B) provided that the debtor pay all "actual disposable income" as a condition of confirmation, that would have little meaning to unsecured creditors, without some projection of what the disposable income would be. Without such a projection, the creditor and the court could not ascertain whether the plan would pay the creditor more than it would receive in a Chapter 7 liquidation. Thus, at the confirmation stage, the plan must promise payment of all projected disposable income, and in so doing, provide a projection of disposable income.

■ While the debtor's projected disposable income may be more or less than the actual disposable income, for purposes of the discharge hearing the Court will look to the actual, not the projected income for a determination of whether the debtor has complied with § 1228. The projected figures are relevant to the Court's inquiry into the reasonableness of claimed expenses, but are not determinative of what disposable income should have been paid into the plan.

■ In attempting to make a prima facie case, FMHA demonstrated that there was a substantial discrepancy in the minimal budget surpluses reflected in the debtors' monthly reports, and the income and expense figures in the debtors' tax returns. FMHA also identified several extraordinary and substantial expenditures relating to the second residence and to non-income producing property. FMHA further attempted to calculate disposable income for each year of the plan, and concluded that the debtors had $84,986.74 in unremitted disposable income over the life of the plan. This figure was derived from adding the debtors' wage and rent income claimed on their 1988–1991 federal in-

come tax returns; and deducting taxes withheld from their wages, cash farm expenses claimed as deductions on their tax returns, payments made to the Chapter 12 Trustee per the trustee's report, and $15,000 per year in family living expenses for the years 1988–1991. The figures on the tax returns are not conclusive because the debtors' actual expenses probably exceeded their deductible expenses. Furthermore, FMHA's analysis ignored the fact that the 1988 and 1991 returns include income and expenses for months in which the debtors were not operating under the Chapter 12 plan.

█ Nevertheless, by identifying substantial discrepancies between the tax returns and the monthly reports, identifying questionable expenses and calculating disposable income, FMHA made a prima facie case that there was unremitted disposable income. Upon such a showing, the burden of persuasion shifted to the debtors to justify the questionable expenditures, and explain any significant discrepancies in their records. The Court agrees with the rationale in *In re Kuhlman*, 118 B.R. 731 (Bankr.D.S.D.1990), and *In re Wood*, 122 B.R. 107 (Bankr.D.Idaho 1990), that the onus is on the debtors to explain such discrepancies and questionable items.

As the Advisory Committee Note to Rule 4005 of the Federal Rules of Bankruptcy Procedure [concerning the burden of proof in § 727 objections to discharge] states, in determining when the burden of proof shifts from the objector to the debtor, the court should consider the "difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector."

In the case at bar, the debtors have all the financial records and have prepared periodic reports of their income and expenses. They are in the best position to explain why the expenses are reasonably necessary for maintenance and support, or continuation, preservation or operation of their business. The debtors' monthly reports batch rather than itemize many of the questionable expenses. FMHA has no independent way of ascertaining what expenses were actually incurred for "labor, insurance, improvements or repairs"; nor of ascertaining which of these expenses were for maintenance and support, which were for preservation, which were for continuation and the like. Thus, once FMHA establishes a significant discrepancy in figures on the reports and the tax returns, or establishes that the actual expenses significantly exceeded the projected expenses, the burden shifts to the debtors to justify these figures. Given the inadequacy of their records, the debtors are the only ones who can explain and justify the expenditures. Therefore, the burden of persuasion must rest with them.

█ The debtors have utterly failed to meet their burden. They have not identified their actual expenditures for certain questionable expenses. While the Court finds that expenses associated with their second residence and commuting costs were necessary; without knowing the actual expenses incurred, the Court cannot determine the reasonableness of these expenses.

█ For the same reason, the Court cannot determine whether the actual expenses incurred for maintenance of the hog facility were reasonable. The Court is persuaded that it was necessary to keep the facility operational in order to attract prospective tenants. Section 1225(b)(2) contemplates that disposable income does not include expenses to operate an ongoing business, and expenses to preserve an inactive business that will hopefully produce income in the future. Yet, the expenses related to the hog facility, though necessary, might not be reasonable when compared to the anticipated income from leasing the facility. Not only did the debtors fail to offer evidence of their actual expenditures, they did not show what, if any, the potential rental income was. Floyd Meyer testified that they leased the hog facility for one year during the plan; yet, the debtors' records do not reveal what rental income they received from the hog facility. Thus, the Court has no basis to determine the reasonableness of the debtors' expenses in keeping the facility operational for the two years that the facility was idle.

The labor expense is more troubling. The debtors have failed to specify the actual

**426**

amount paid to their children; nor have they presented evidence by which a calculation could be made. The Court does not know how many hours the children worked, nor their hourly wages. Furthermore, despite Floyd Meyer's testimony that the children maintained the rental land as well as the hog facility, Schedule E of the debtors' tax returns, detailing their income and expenses from the rental property, reflects only minimal labor expense on the rental property.[6] This does not comport with the total labor expense claimed on their monthly reports during the plan ($11,045.76 in identifiable labor expense; $13,768.40 in batched expenses that include labor).

 Moreover, the Court is not convinced that any compensation paid to their children was reasonable and necessary. Their children were adults who lived with and were supported by the debtors. Although the children obtained student loans, the debtors also contributed to their college education expenses. Thus, the children were supported by their parents, provided educational funds, and paid for their labor on the farm. While expenses for education and support of adult children are not necessarily disallowable, it is unreasonable to further enrich one's dependent children with "compensation" for part-time household and farm work, to the detriment of the unsecured creditors.[7]

The debtors have failed to satisfy their burden of persuading the Court that all expenditures were reasonable, necessary and allowable. Thus, the debtors have failed to persuade the Court that they have paid to the trustee their actual disposable income. Therefore, the trustee's motion to terminate and discharge the debtors and trustee is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the trustee's motion for

---

**6.** On the 1988 return, the debtors claimed $152 in labor expense. On the 1989 return they claimed $280 in labor expense. On the 1990 return they claimed $921 in labor expense. The 1991 return has no Schedule E.

**7.** Reasonably necessary expenses for the support of dependent children, even dependent children older than 18 years of age, may be deducted

termination of the Chapter 12 proceeding and for discharge of the debtors and trustee is DENIED.

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

when determining disposable income. Support may include reasonably necessary expenses for college tuition. *See In re Jones,* 55 B.R. 462, 467 (Bankr.D.Minn.1985); *In re Riegodedios,* 146 B.R. 691, 693 (Bankr.E.D.Va.1992); *In re Gonzales,* 157 B.R. 604, 610–11 (Bankr.E.D.Mich. 1993).